Richard D. SCHOEN, Plaintiff,

v.

CONSUMERS UNITED GROUP, INC.
and Consumers United Insurance
Company, Defendants.

Civ. A. No. 85–608.

United States District Court,
District of Columbia.

June 6, 1986.

Bruce A. Fredrickson, Washington, D.C., for plaintiff.

David J. Cynamon, Washington, D.C., for defendants.

## MEMORANDUM OPINION

### JOHN H. PRATT, District Judge.

On February 4, 1985, Richard D. Schoen was formally demoted from his position as Chief Financial Officer of Consumers United Group, Inc. (CUG) to temporary Senior Accountant of Consumers United Insurance Company (CUIC), a subsidiary of CUG. His salary dropped correspondingly, from approximately $49,000 to $31,000. Schoen has brought a diversity action against both CUG and CUIC for age discrimination, breach of contract and other unlawful acts. Before the court are the parties' cross-motions for summary judgment.

## BACKGROUND

In January 1971, Richard Schoen was hired by International Group Plans (IGP), the corporate predecessor of defendant CUG, as Vice President for Accounting and Data Processing. He was then forty-two years old. Schoen did not sign or receive a formal employment contract. Schoen Dep. at 48. Rather, the President of IGP, James Gibbons,[1] sent him "just a very conventional letter" confirming Gibbons' earlier, oral offer of the job at a starting salary of $30,000 per year. Schoen Dep. at 21, 247–48

Schoen rose to the position of Chief Financial Officer (CFO) of CUG in 1975. His duties as CFO are stated to include preparation and implementation of the annual financial plan, overall cash management of the company, negotiation of bank loans, real estate transactions, legal coordination with outside counsel, management of CUG's investment program, and negotiation with insurance carriers. Schoen Dep. at 66–67.

The evaluations of Schoen's performance during this period include mixed reviews. On the one hand he is described as "an expert in the field of Accounting," Pl. Ex. 4, whose work was "exemplary." Pl. Ex. 5. On the other hand he is characterized as sloppy, unprofessional and a poor manager. See, e.g., Hopkins Dep. at 63; Def. Ex. 3 at 2–3; Clark Dep. at 69–70. In any event, from 1979 until 1982 Schoen's salary increased periodically, and Schoen never received any direct criticisms of his work. Schoen Aff., Pl. Ex. 1, at ¶ 5.[2]

Although Schoen retained the title of CFO until 1985, he exercised the duties of that position generally only until the fall of 1982. At that time he was appointed Executive Director of the Institute of Financial Management, a program designed to market the company's financial self-assessment products.

In the meantime CUG was suffering from a severe financial crisis. In 1980 it had lost its major client, The Retired Officers Association, which had accounted for approximately 55% of the corporation's revenues and 70% of its profits. Faced with the problem of being overstaffed as a result of heavy operating losses, CUG leaders developed an "action plan" to trim the number of company personnel.[3] Under the plan, an Audit Team would evaluate the performance of CUG employees. Those who did not fulfill the requisite standards would eventually be terminated. As an alternative, any employee could accept a "buy-out" option, which promised three-

---

**1.** The rather unusual position of Gibbons cannot be underestimated. Not only was he President of IGP but he subsequently conveyed his entire, 100% of stock interest to CUG for which he received no payment. His idealistic conception of CUG and its various companies reflects a form of altruism which is very rare in this day and age.

**2.** It is clear to us that this absence of direct criticism stemmed not from the quality of plaintiff's job performance which we suspect was only average at best, but from the reluctance of those in the organization, influenced by the humanitarian motives of Gibbons, its founder, to injure the feelings of a loyal and dedicated employee.

**3.** Personnel was reduced from over 300 in 1980 to 209 at the end of 1982. As of February 4, 1985, this figure had been further reduced to 109, of whom fifty-nine were over forty and sixty under forty. Def. Memo. at 28.

months' severance pay in return for resignation.

The Audit Team never formally evaluated Schoen. Schoen Aff. at ¶ 8. Yet in November 1983, two of the three members of the Team, Gibbons and Delbert Clark, met with Schoen. Gibbons told Schoen that reorganization of the company left no place for him. Schoen Aff. at ¶ 9. Gibbons offered Schoen the choice of either resigning immediately and providing accounting services to CUG on a contract basis or remaining at the company, temporarily, at full pay, while looking for another job. He did not offer Schoen the option of remaining at CUG permanently. Schoen Aff. at ¶ 9. Schoen chose to stay temporarily and look for a job outside the company.

By August 1984, while continuing to draw his maximum salary, Schoen still had not found alternative employment. That month Gerald Hopkins, Chairperson of the CUG Legislative Assembly, or Board of Directors, apparently sent Schoen a memorandum inviting Schoen to apply for any position in the company or to allow himself simply to be placed in another position, at commensurate salary. *See* Pl. Ex. 13 at 1. In a January 27, 1985 memo, Hopkins directed Schoen either to resign from CUG or to assume a position as temporary Senior Accountant for CUIC. *Id.* at 2, 5. When Schoen did not suggest a third option, he was placed at the Senior Accountant position at a salary of $31,000. Although Hopkins' memo indicated that this was a "temporary" job and would last three to six months, Schoen continues to hold that position today.

On February 20, 1985 Schoen filed the present action in this court against CUG and CUIC. His complaint alleged age discrimination in violation of the District of Columbia Human Rights Act, aiding and abetting violation of the Human Rights Act, breach of an alleged contract guaranteeing lifetime employment without reduction in salary, intentional interference with contract, intentional infliction of emotional distress, promissory estoppel, fraud and misrepresentation, and breach of the im-

plied covenant of fair dealing. On March 7, 1985, the CUG Board of Directors voted to remove Schoen from one of his responsibilities, Administrator of CUG's Retirement Plan—a position he had held since 1982. The Board also failed to reelect Schoen as Secretary of the Board. On September 30, 1985, Schoen filed a supplemental complaint adding a claim of retaliation in violation of the D.C. Human Rights Act based both on his removal as Retirement Plan Administrator and on denial of facilities and training allegedly afforded others of similar rank or position.

Defendants now move for summary judgment on the entire cause of action. Plaintiff has filed separate cross-motions for summary judgment on the retaliation and breach of contract claims.

## DISCUSSION

Summary judgment may not be lightly granted. Under Rule 56 of the Federal Rules of Civil Procedure, the moving party must show both absence of any genuine issue of material fact and entitlement to judgment as a matter of law. In analyzing the parties' cross-motions for summary judgment, we are required to view the evidence in the light most favorable to the party opposing the motion. *Bloomgarden v. Coyer*, 479 F.2d 201, 208 (D.C. Cir.1973). If the record indicates the existence of a genuine issue as to any material fact, we may not grant summary judgment and thereby cut off a party's right to have factual questions determined at trial. *Bloomgarden*, 479 F.2d at 206. With these principles in mind, we turn to plaintiff's specific claims.

### I. *Age Discrimination*

Plaintiff's claim of age discrimination in violation of the D.C. Human Rights Act, D.C. Code § 1–2501, *et seq.*, which is the basic thrust of plaintiff's action, triggers the familiar evidentiary analysis of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). In *McDonnell Douglas* the Supreme Court outlined the basic allocation of proof in a case of alleged racial discrimination. Al-

though well established in the case law, we set it forth again. First, the plaintiff must establish a *prima facie* case of discrimination. · If he or she succeeds, the burden of production then shifts to the defendant, who must articulate some legitimate, non-discriminatory reason for the action against the employee. If the defendant fulfills this task, the burden shifts back to the plaintiff, who must prove that the defendant's stated reason is in fact a pretext for discrimination. 411 U.S. at 802, 804, 93 S.Ct. at 1824, 1825. Although framed in the context of a suit under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.*, this three-tier analysis has been made applicable (with appropriate modifications) to claims of age discrimination under the Age Discrimination in Employment Act (ADEA), 29 U.S.C. § 621, *et seq. See, e.g., Cuddy v. Carmen*, 694 F.2d 853 (D.C. Cir. 1982); *Sutton v. Atlantic Richfield Co.*, 646 F.2d 407 (9th Cir.1981); *Loeb v. Textron, Inc.*, 600 F.2d 1003 (1st Cir.1979). By analogy the District of Columbia courts have adopted the *McDonnell Douglas* evidentiary standard specifically in age discrimination cases under the D.C. Human Rights Act. *See, e.g., Miller v. American Coalition of Citizens with Disabilities*, 485 A.2d 186 (D.C. 1984).

Before attempting to assess plaintiff's *prima facie* showing, we need to define the "adverse action" at the base of plaintiff's age discrimiantion claim. Defendants refer generally to Schoen's ·"reassignment" or "demotion." Yet the complaint charges defendants with "intentional course of conduct" in violation of the Human Rights Act. More than a simple demotion, this "course of conduct" apparently encompasses three distinct junctures of Schoen's career at CUG: (1) the assumption of his CFO duties by others in the fall of 1982 and his assignment to the financial self-assessment products, (2) defendants' request in November 1983 that Schoen leave CUG altogether, and (3) the February 1985 reassignment to Senior Accountant, with accompanying salary reduction. Thus, while Schoen was formally "demoted" in February 1985, our analysis of this final employment decision incorporates the various actions that led up to it.

By way of refinement of its holding, the Supreme Court in *McDonnell Douglas* prescribed four factors on which. a plaintiff may base a *prima facie* showing of discrimination. Although lower courts have varied both the wording and order of these factors, the Court of Appeals for this Circuit has held that a plaintiff satisfies the initial burden in proving a *prima facie* case of alleged age discrimination in hiring by showing that he or she (1) belongs to the statutorily protected age group, (2) was qualified for the position, (3) was not hired, and (4) was disadvantaged in favor of a younger person. *Cuddy v. Carmen*, 694 F.2d at 857; *see also Coburn v. Pan American World Airways, Inc.*, 711 F.2d 339, 342 (D.C. Cir.1983). This formulation need not be limited to hiring since we can easily substitute a demotion requirement for the third factor, failure to be hired.

The cumulative nature of the actions that led to Schoen's reassignment allow us to use this four-part test only as a starting point. The facts of this case can sensibly be tested by the first and third factors, and Schoen facially satisfies both requirements. In prohibiting age discrimination in employment, the D.C. Human Rights Act broadly defines "age" as "18 to 65 years of age," for employment purposes. D.C. Code § 1–2502(2). Schoen therefore falls within the protected age group, and defendants do not dispute that they demoted Schoen. Memorandum in Support of Defendants' Motion for Summary Judgment (Def. Memo.) at 24–25; *see* Hopkins Dep. at 88.

The second factor, qualification for position, provides a less certain guideline for measuring the existence of discrimination under the facts here presented. Unlike most discrimination cases, where the plaintiff sought or held a discrete job, the present case involves a two-and-a-half year evolution of duties. Schoen's success in proving he was qualified depends on what position he is considered to have held at the time of his demotion.

Defendants' analysis reveals the complexity in this case in attempting to deter-

mine plaintiff's qualifications. Relying on the First Circuit's interpretation of being "qualified", defendants claim Schoen was not "performing his job at a level that met his employer's legitimate expectations." *Loeb v. Textron*, 600 F.2d at 1014. Specifically, they emphasize the fact that since others had already assumed his duties by the time of his demotion, Schoen was not performing his job at all. Def. Memo. at 25. This reasoning stretches too far. An unscrupulous employer could always whittle away the employee's responsibilities and then point to the employee's failure to perform such responsibilities as evidence of unfulfilled expectations. Our inquiry into the issue of Schoen's qualifications for the job from which he was demoted, Chief Financial Officer, is thus made more difficult by the fact that, due to defendants' removal of Schoen's responsibilities, there were no longer any duties against which to assess Schoen's performance. This problem requires the additional step of inquiring into the reasons for removal of plaintiff's duties as originally assigned.

■ The list of achievements that Schoen presents, *see* Plaintiff's Memorandum in Opposition to Defendants' Motion for Summary Judgment (Pl. Opp.) at 6, does not persuade us that he was qualified. Defendants offer substantial evidence of criticisms of Schoen's work, despite these accomplishments. *See* Def. Memo. at 6–12. Although Schoen's evaluations include some positive comments, *see* Pl. Ex. 3 ("a job well done!); Pl. Ex. 4 at 2 ("reliable, cooperative, knowledgeable and trustworthy"); Pl. Ex. 5 ("just a few examples of the fine comments made about Mr. Schoen"), they do not demonstrate his overall qualification for the job, particularly since the last written evaluation was prepared in January 1979 and plaintiff has presented no evidence of positive performance at the time his CFO duties were assumed by others, more than three and a half years later. Moreover, even if we assume Schoen was qualified to be CFO, we cannot conclude he has therefore made out a *prima facie* case of age discrimination. As we discuss below, in connection with the fourth factor of the *McDonnell*

*Douglas/Cuddy* test, there is simply no evidence in the record that creates an inference that defendants even considered Schoen's age when they demoted him.

The reassignment in February 1985 to the position of Senior Accountant under the supervision of a younger employee offers little insight into the issue of discrimination. By the time Schoen was actually demoted in February 1985, his duties as CFO had long been assumed by others, mainly Gibbons. Defendants also abolished the job title of Chief Financial Officer. Once Schoen's job disappeared, it is difficult to see how he could have been disadvantaged in favor of anyone else.

■ Furthermore, we can find no discrimination in comparing Schoen to his chief replacement, Gibbons. Although the parties have not identified Schoen's birthdate, the record pegs him as only a year or two older than Gibbons. While this differential may technically satisfy the requirement of being disadvantaged in favor of a younger person, we can infer no discrimination from the assumption of duties by the company president and chief benefactor, a man so close in age to plaintiff. *See Douglas v. Anderson*, 656 F.2d 528, 533 (9th Cir.1981) ("If the replacement is only slightly younger than the plaintiff, then it is less likely that an inference of discrimination can be drawn"); *see also Pace v. Southern Railway System*, 701 F.2d 1383, 1390 (11th Cir.1983) (two-year age differential not enough where no other evidence of discrimination).

■ As plaintiff has pointed out, satisfying the *McDonnell Douglas* four-part test does not represent the only route to a *prima facie* showing of discrimination. *See Furnco Construction Corp. v. Waters*, 438 U.S. 567, 577, 98 S.Ct. 2943, 2949, 57 L.Ed.2d 957 (1978); *McDonnell Douglas*, 411 U.S. at 802 n. 13, 93 S.Ct. at 1824 n. 13; *McCorstin v. United States Steel Corp.*, 621 F.2d 749, 753 (5th Cir.1980) (*McDonnell Douglas* test "not the alpha and omega of possible tests in the age discrimination context"). Schoen needs only to "demonstrate facts sufficient to

create a reasonable inference that age discrimination was a 'determining factor' in the employment decision." *Cuddy v. Carmen,* 694 F.2d at 856–57. Such facts could be either direct evidence of discrimination or statistical evidence of disparate treatment. *See Pace,* 701 F.2d at 1388; *Baldwin v. Sears, Roebuck & Co.,* 667 F.2d 458, 462 (5th Cir.1982); *Hogan v. Pierce,* 31 FEP Cases 115, 124 (D.D.C. 1983). In failing to present either type of evidence, plaintiff has been unable to create a reasonable inference that his age was a "determining factor" in his demotion.

Plaintiff has presented no statistical evidence to show a pattern or practice of age discrimination by defendants. Plaintiff mentions only the fact that of the four employees who involuntarily resigned since January 1, 1980, all were over forty. Pl. Opp. at 44. The size of this sample is clearly too small to offer the basis for any meaningful analysis. Furthermore, plaintiff focuses too narrowly when he looks only at involuntary resignations. In view of the buy-out option offered all employees in 1983, the distinction between voluntary resignations and involuntary resignations or terminations blurs. As defendants note in their reply brief, between January 1, 1980 and February 4, 1985, thirty-seven employees were terminated or resigned involuntarily. Only nine of these thirty-seven—a smaller percentage than the percentage of older workers remaining at CUG—were over forty. Def. Answers to Pl. First Set of Ints., No. 3 and Ex. A; Def. Reply at 12. We can identify no pattern of discrimination from such a sparse statistical showing.

Plaintiff's discussion of defendants' discriminatory treatment of Schoen omits one crucial element: the casual link between defendants' actions and Schoen's age. Plaintiff enumerates what he considers to be examples of defendants' discriminatory conduct: defendants' bypassing mandatory procedures in demoting Schoen, defendants' failure to criticize Schoen directly, and the assignment of Schoen to work under a thirty-one year old supervisor with qualifications inferior to Schoen's. To plaintiff, the "only plausible explanation"

for this behavior is unlawful age discrimination. We are not persuaded.

It must be emphasized that the D.C. Human Rights Act prohibits not *all* discrimination but only discrimination based on certain factors, including age. Schoen "draws a compelling picture of a long-time loyal employee who may have been treated less than fairly." *Coburn,* 711 F.2d at 345. Yet in order to establish a *prima facie* case, he must show that age was a "determining factor" in the employment decision. *Cuddy,* 694 F.2d at 856–57. While defendants may have treated Schoen differently than other employees, plaintiff has produced no evidence that even remotely suggests age was a determining factor in this "discrimination."

We conclude that in failing to produce evidence to support an inference of age discrimination, plaintiff has failed to establish his *prima facie* case. We do not need to proceed to the second stage of the *McDonnell Douglas* evidentiary analysis, *i.e.,* the burden on defendants to articulate legitimate, non-discriminatory reasons for the actions it took, since there is no *prima facie* showing of unlawful discrimination. Plaintiff cannot defeat summary judgment for defendants "by the vague hope that something may turn up at trial." *E.P. Hinkel & Co., Inc. v. Manhattan Co.,* 506 F.2d 201, 205 (D.C. Cir.1974). Finding that there is no genuine issue as to any material fact and that defendants are entitled to judgment as a matter of law, we grant summary judgment for defendants on Count I of the complaint, plaintiff's lynchpin claim of age discrimination. We also grant summary judgment for defendants on Count II, plaintiff's claim of aiding and abetting violation of the Human Rights Act. The validity of this claim necessarily depends on a finding of such a violation. In view of our holding that defendants have not violated the Human Rights Act, Count II also must fail.

## II. *Retaliation*

The D.C. Human Rights Act prohibits an employer from retaliating against any per-

son on account of having exercised or enjoyed any right granted or protected under the Act. D.C. Code § 1–2525. Plaintiff's claim of unlawful retaliation incorporates three allegations. Plaintiff contends that in retaliation for filing this suit, defendants (1) removed him from his position as Administrator of the CUG pension plan, (2) removed him from his position as Secretary of CUG's Board of Directors, and (3) denied him facilities and training offered to others similarly situated.

We will analyze these three claims according to the *McDonnell Douglas* framework for shifting the burden of production. Thus, if plaintiff establishes a *prima facie* case of retaliation the burden shifts to defendants to articulate a legitimate, nondiscriminatory reason for their action. The burden then shifts back to the plaintiff to prove by a preponderance of the evidence that defendants' proffered reason was merely a pretext for retaliation. *McKenna v. Weinberger*, 729 F.2d 783, 790 (D.C. Cir. 1984).

## A. *Removal as Administrator of the Pension Plan*

■ Plaintiff satisfies his initial burden of production on his claim of retaliation in being removed as pension plan Administrator. In order to establish a *prima facie* case of retaliation, plaintiff must show that (1) he was engaged in statutorily protected activity, (2) the employer took an adverse personnel action, and (3) a causal connection existed between the two. *McKenna*, 729 F.2d at 790. First, since by the time of his removal on March 7, 1985, Schoen had already commenced his age discrimination action under the D.C. Human Rights Act, he was clearly engaged in statutorily protected activity. The fact that his age discrimination claim later turned out to be unsuccessful is irrelevant to plaintiff's *prima facie* case of retaliation. *See Rogers v. McCall*, 488 F. Supp. 689, 697 (D.D.C.1980); *Francis v. American Telephone and Telegraph Company, Long Lines Department*, 55 F.R.D. 202 (D.D.C. 1972).

Second, plaintiff's removal from his position as pension plan Administrator represents an adverse personnel action. We reject defendants' argument that in order to constitute an "unlawful discriminatory practice" under the D.C. Human Rights Act, the action must always affect "compensation, terms, conditions, or privileges of employment." *See* Def. Memo. at 40; Defendants' Opposition to Plaintiff's Motion for Summary Judgment (Def. Opp.) at 2–4. D.C. Code § 1–2512, which requires such a tangible impact, applies to direct discriminatory practices. Nowhere does the provision on retaliation, § 1–2525, limit the definition of retaliation to actions that affect monetary benefits. Defendants cite no authority to support the proposition that actionable retaliation *must* include monetary disadvantage, and in fact the cases suggest the opposite. *See Mead v. U.S. Fidelity and Guaranty Co.*, 442 F. Supp. 114, 135 (D.Minn.1977) (perceiving retaliatory actions as "including retaliatory discharge *and* retaliatory and selective surveillance and monitoring ..." (emphasis supplied)); *E.E.O.C. v. Union Bank of Arizona*, 12 FEP Cases 527 (D.Az.1976) (retaliatory acts *include* demotion, monitoring, creating animosities, and suspension). Moreover, defendants' prerequisite would undermine the protection of § 1–2525, since an employer could subject an employee to numerous acts of intolerable harassment in overt retaliation without actually reducing the employee's salary or benefits. We do not interpret the statute's prohibition against retaliation so narrowly.

In the context of defendants' motion for summary judgment, plaintiff also satisfies the third *prima facie* factor. Defendants admit for the limited purposes of their motion that they replaced Schoen as Administrator expressly because of the pending lawsuit. *See* Def. Memo. at 40; Clark Dep., Ex. A to Plaintiff's Memorandum in Support of Motion for Summary Judgment: Retaliation (Pl. Memo), at 115.

Since plaintiff has established a *prima facie* case of retaliation, the burden shifts to defendants to articulate some legitimate reason for the action against Schoen. Defendants offer an unusual justification for this action. Unlike most employer rationales, such as poor performance by the

employee or workforce reduction, defendants' stated reason is the fact of litigation itself: they removed Schoen because his fiduciary obligations as pension plan Administrator allegedly conflicted with his adversarial position as litigant. In effect, they admit that the litigation prompted them to remove Schoen but assert that the facts of the case fully justify this reaction.

■ We agree. As Administrator of the pension plan, Schoen owed a fiduciary duty to the plan and its beneficiaries, the employee-owners of CUG. Specifically, he was required by the Employee Retirement Income Security Act, 29 U.S.C. § 1001, *et seq.*, to act "solely in the interest of the participants and beneficiaries" and to discharge his duties "with the care, skill, prudence and diligence ... that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character." 29 U.S.C. § 1104(a)(1)(B); *Fink v. National Savings and Trust Co.*, 772 F.2d 951, 955 (D.C. Cir.1985). Failure to meet these fiduciary obligations could have resulted in Schoen's personal liability for any ensuing losses. 29 U.S.C. § 1109(a); *Fink*, 772 F.2d at 955.

The scope and spirit of Schoen's lawsuit against CUG conflicted with his fiduciary duties. As Schoen freely acknowledges, recovery of the $3,520,000 he claims as damages "would have a significant adverse impact on the company." Schoen Dep. at 421. Since the pension plan depends on CUG for its funding, Schoen's threat to the already precarious financial condition of CUG also treatens the strength and even survival of the plan. Furthermore, Schoen confesses that in bringing his lawsuit, he was "going after" the company as a whole, "including the other employees of the company." Schoen Dep. at 422. Yet it is these employees to whom Schoen owes his statutorily defined fiduciary duties. We recog-

nize that in the usual situation, a distinction might be drawn between the interests of a corporate defendant and those of a pension plan's employee-beneficiaries. But here, where the plan's beneficiaries own the company, we find that Schoen could not maintain his antagonistic position toward the company's employees and at the same time act "solely" in the interest of those same individuals.

We hold therefore that defendants acted properly when they removed Schoen from his position as Administrator of the pension plan. Since defendants have in effect conceded a "retaliatory" motive, it would be fruitless to proceed to the third stage of the *McDonnell Douglas* analysis. We grant summary judgment for defendants on this claim.

### B. *Failure to Be Reelected as Secretary to the Board*

Plaintiff contends that the Board of Trustees unlawfully retaliated against him when it failed to reelect him as its Secretary.[4]

Plaintiff satisfies the first and third elements of his *prima facie* burden. He was engaged in protected activity, the lawsuit. And the record, specifically the testimony of Del Clark, demonstrates a causal connection between the lawsuit and the Board's failure to reelect Schoen as Secretary.[5]

The second element, adverse action by the employer, raises more doubt. Despite plaintiff's characterization, the Board did not "remove" Schoen. It simply failed to reelect him. We do not hold, however, that plaintiff thus fails to state a cause of action. *See* Def. Opp. at 2 n. 1. Failure to reelect represents as much a collective decision as voting to remove, particularly in view of Clark's description of the Board

4. Although this allegation indeed represents an "eleventh-hour unilateral amendment to the supplemental complaint," Def. Opp. at 2, we will not ignore plaintiff's claim. Particularly in view of our holding on this issue, defendants are not prejudiced by our consideration of the claim.

5. Unlike the issue of Schoen's removal as Administrator, there is no factual uncertainty over the Board's motive in failing to reelect him as Secretary. Lehrfeld's statement relates only to Schoen's position as Administrator. The record does not counter Clark's statement that Schoen was removed as Secretary because of the lawsuit.

action as simply a response to his recommendation.

■ The more troubling issue is Schoen's failure to stand for reelection. Defendants suggest that since Schoen could have nominated himself, defendants should not be blamed for failing to vote for someone who was not even a candidate. Although facially appealing, this reasoning does not justify summary judgment for defendants based on failure to state a claim. Furthermore, we expect that Schoen may have chosen not to nominate himself because Board sentiment indicated his candidacy would be futile. Where the record before us is silent on why Schoen was never nominated, we cannot determine whether defendants were in fact responsible for Schoen's failure to run for office and thus be reelected as Secretary.

■ Even if we assume plaintiff has made out a *prima facie* case of retaliation, defendants' proffered justification again excuses their action. Defendants argue that Schoen's adversary position conflicted with his fiduciary duties as Secretary of the Board. While we find this question a more complex one than do defendants, we agree with their reasoning as applied to the facts before us.

As Secretary to the Board of Trustees, Schoen assumed the fidiciary responsibilities of a corporate director. It is well-settled that directors owe "certain fundamental fiduciary obligations to the corporation and its shareholders." *Pogostin v. Rice,* 480 A.2d 619 (Del. 1984); *Guth v. Loft,* 23 Del.Ch. 255, 5 A.2d 503, 510 (1939). Schoen's fiduciary duty required him generally to promote the interests of the corporation, *United States v. Byrum,* 408 U.S. 125, 138, 92 S.Ct. 2382, 2391, 33 L.Ed.2d 238 (1972), and to prevent a conflict of interest from arising. *Manufacturers Trust Co. v. Becker,* 338 U.S. 304, 312, 70 S.Ct. 127, 132, 94 L.Ed. 107 (1949); *Guth,* 5 A.2d at 510.

Schoen's lawsuit threatened to compromise his fiduciary loyalty. To begin with, his interest in the massive monetary award he demands conflicts with his interest as director in the company's profitability. In the absence of any record of the company's recent profits, we decline to adopt defendants' broad label of the damages claim as "potentially bankrupting." However, we believe that it is fair to assume that a damage award of over $3.5 million could severely injure CUG, which has been struggling financially since it lost its major client in 1980. Schoen could not press a litigation demand of such magnitude and at the same time "refrain from doing anything that would work injury to the corporation." *Guth,* 5 A.2d at 510; *cf. Cumming v. Johnson,* 616 F.2d 1069, 1076 (9th Cir.1979) (director may have had fiduciary obligation to settle a lawsuit against the corporation).

Furthermore, Schoen's emotional investment in the litigation could impede his loyalty as a director. Schoen's professed bitterness toward CUG and its employees, CUG shareholders, could easily taint his objectivity and commitment to the mission of the Board. Similarly, Schoen's antagonism toward the Board, whose members he blames directly for his downfall, Schoen Dep. at 422, could inhibit his effectiveness as a fellow member of the Board. By creating an atmosphere of distrust and hostility, Schoen's presence on the Board could indirectly harm the corporation that depends on Board guidance and strength.

We do not hold that every director who sues his or her corporation must resign from the Board of Directors. We recognize that conflicts of interest frequently and sometimes necessarily occur. We note that corporate boards often include union leaders, bank officials or others who at some time or another, in their roles outside the boardroom, may act to the detriment of the corporation. Without passing on this general problem of the conflict between the interests of the corporation and the interests of a director acting solely in his or her personal capacity, we deny plaintiff's motion for summary judgment. We hold simply that in view of both the magnitude of Schoen's damages claim and his openly vindictive attitude toward CUG and its employee-shareholders, his continued presence on the Board would be inappropriate. We

are surprised plaintiff himself has not recognized the awkwardness of this position.

Since defendants, however, have not moved for summary judgment on this aspect of plaintiff's retaliation claim, we do not grant them relief at this time. We invite defendants to file a formal motion on this single remaining claim of retaliation.

### C. *Denial of Facilities and Training*

█ Plaintiff's claim of disparate treatment in defendants' provision of facilities and training incorrectly assumes similar situation. Schoen's position is one of temporary Senior Accountant. The employees against whom he compares himself are in permanent jobs. Defendants' denial to Schoen of certain facilities[6] and training offered[7] these permanent employees therefore does not represent disparate treatment of employees who are similarly situated.

The fact that it was defendants who placed Schoen in this temporary position does not enable plaintiff to overcome the defects of his *prima facie* case. As discussed above, we find no evidence of age discrimination in Schoen's reassignment. Defendants therefore are not attempting to "piggyback one discriminatory act upon another." Pl. Opp. at 22. Plaintiff may indeed suffer the degradation of menial tasks, but his unique position over many years indicates that he has accepted these hazards. Having failed to establish a *prima facie* case of actionable retaliation, plaintiff is not entitled to summary judgment on this third claim.

### III. *Breach of Contract*

Plaintiff's breach of contract claim includes two allegations. First, in Count III of his complaint, plaintiff charges defendants with breaching their guaranty of lifetime employment with no reduction in salary. Second, in his motion for summary judgment, plaintiff claims defendants breached their employment contract with

him by failing to follow their own disciplinary procedures.

### A. *Lifetime Employment Without Salary Reduction*

█ The only issue here is whether defendants were obligated by contract to maintain Schoen's salary. Schoen has never left defendants' service. Thus, his claim that defendants breached a promise to provide lifetime employment fails to state a claim upon which relief can be granted.

█ The record further reveals no evidence of a contract prohibiting defendants from reducing Schoen's salary. In general we must assume that the parties intended an ordinary business contract, unless the parties express a contrary intent. *See Littell v. Evening Star Newspaper Co.*, 120 F.2d 36, 37 (D.C. Cir.1941). Schoen admits that he had no written contract of employment but was hired into an ordinary at-will relationship. *See* Def. Statement of Material Facts, ¶ 1. The only written statement by defendants on the issue of salary reductions not only fails to proscribe but even permits such action. *See* CUG Community Guidelines, Def. Ex. 16, at 34; Def. Memo. at 47 & n. 9.

█ Plaintiff's reliance on the resolution adopted by the CUG Board is misplaced. On November 4, 1983, four members of the Board passed a resolution to maintain the salaries of CUG employees who are removed. However, this Board meeting lacked a quorum. Since CUG is a Delaware corporation, a majority of the total number of directors makes up a quorum. 8 Del. Corp. Law Ann. § 141(b) (1984); CUG By-Laws, Def. Ex. 19, at 8. On November 4, 1983, there were twelve authorized directors of CUG, Hopkins Dep. at 103, of whom only five were present at the meeting. This lack of a quorum renders the resolution that was passed void and of no force and effect. *See Belle Isle Corp. v. MacBean*, 29 Del.Ch. 261, 49 A.2d 5, 9 (1946); *Mecleary v. John S. Me-*

---

**6.** Plaintiff's complaint about defendants' failure to supply plaintiff with a private office is also frivolous. Defs. Memo. at 43, n. 8.

**7.** Plaintiff did not receive computer training of five days duration. This claim would seem to be "de minimis."

*cleary, Inc.,* 13 Del.Ch. 329, 119 A. 557, 559 (1923).[8]

Plaintiff has not shown that the November 4, 1983 resolution, although itself void, was merely confirming a policy that already existed. Plaintiff emphasizes the October 24, 1983 report of Charmaine Carter that "long standing CUG policy" guaranteed salary maintenance. *See* Pl. Ex 19. This memorandum, which cites no written statement but reflects Carter's personal opinion, hardly demonstrates CUG policy.

## B. *Disciplinary Procedures*

Defendants' argument that the standard disciplinary procedures do not apply to Schoen's demotion oversimplifies the actions against Schoen. Plaintiff claims, and defendants do not dispute, that defendants frequently acted in an informal fashion and failed to follow the disciplinary procedures set out in the CUG Community Guidelines. The Guidelines provide for a series of notices and a probationary period before an employee is terminated. The fact that these procedures apply only to terminations does not alone excuse defendants' bypassing them. To be sure, the end result of plaintiff's career transition was demotion—reassignment to the position of Senior Accountant. Yet this ultimate outcome cannot erase the nine months, from the November 1983 meeting with Gibbons and Clark to the August 1984 Hopkins memorandum that for the first time offered the possibility of another position within the company, during which Schoen was under an obligation to seek another job since there was "no place" for him at CUG. Schoen Aff. at ¶ 9. Had Schoen found other employment, defendants would have terminated him without following the requisite procedures. They should not be allowed to benefit from the fortuity that Schoen remained at CUG until they decided to demote him instead.

■ Defendants' failure to follow required procedures, however, does not represent actionable breach of contract. The key focus is on the parties' intent at the

time of contract. *See Hodge v. Evans Financial Corp.,* 707 F.2d 1566, 1568 (D.C. Cir.1983); *Littell,* 120 F.2d at 37. While policy statements or personnel guidelines may reach the level of contractual obligation, *see Greene v. Howard University,* 412 F.2d 1128, 1133 n. 4 (D.C. Cir.1969); *Washington Welfare Association, Inc. v. Wheeler,* 496 A.2d 613, 615 (D.C. 1985), these procedures were not bargained for at any time and were not a part of Schoen's employment contract when he was hired. They were unilaterally adopted by CUG twelve years later. Although some courts have held that personnel policies adopted after the hiring may modify the terms of the initial contract, *see Barger v. General Electric Co.,* 599 F.Supp. 1154 (W.D. Va. 1984), no District of Columbia court has so held, and we do not believe that Schoen offered the consideration necessary to make binding for his benefit the additional promises contained in the Guidelines. *See Murray v. Lichtman,* 339 F.2d 749 (D.C. Cir.1964) (promise to perform pre-existing duties not sufficient consideration for agreement to alter obligation). We conclude that since the guidelines did not exist at the time of Schoen's original employment contract, they do not bind defendants in their dealings with Schoen. And in the absence of a contractual obligation to follow their own disciplinary procedures, defendants could not have breached their contract with Schoen. Similarly, Schoen's lack of any contractual rights to full salary or disciplinary procedures dooms his claim of intentional interference with contract. We grant summary judgment for defendants on Counts III and IV.

## IV. *Intentional Infliction of Emotional Distress*

Plaintiff fails to support the elements of his claim for intentional infliction of emotional distress. In the District of Columbia, it is settled that this tort consists of "(1) 'extreme and outrageous' conduct on the part of the defendant which (2) intentionally or recklessly (3) causes the plain-

---

**8.** The fact that the CUG Board has often transacted business without a quorum present, Pl.

Opp. at 33–34, does not validate this resolution when challenged.

tiff 'severe emotional distress.'" *Sere v. Group Hospitalization, Inc.*, 443 A.2d 33, 37 (D.C. 1982) (quoting Restatement (Second) of Torts § 46 (1965)). Plaintiff cannot master the first requirement.

■ We find that defendants' actions, while perhaps somewhat insensitive and unfair, do not approach the level of "extreme and outrageous" conduct. As defendants note, adverse actions taken against an employee by an employer do not necessarily constitute "extreme and outrageous" behavior. *See, e.g., Shewmaker v. Minchew*, 504 F.Supp. 156, 163 (D.D.C. 1980) (no intentional infliction of emotional distress in demotion and harassment); *Waldon v. Covington*, 415 A.2d 1070, 1077–78 (D.C. 1980) (no intentional infliction of emotional distress in university's harassment of professor). Plaintiff's citation to cases where proof of racial or sexual harassment may create a *prima facie* case of intentional infliction, *see* Pl. Opp. at 51–52, does not aid him. As we discussed above, plaintiff has failed to prove discriminatory harassment. Furthermore, the actions of which plaintiff complains—breach of confidentiality, dismissal without prior disciplinary procedures, "an unbroken string of humiliations and attempts to force Plaintiff Schoen to resign" Pl. Opp. at 53–55—simply do not satisfy the standard for liability. The tort of intentional infliction of emotional distress requires "conduct that goes 'beyond all possible bounds of decency and [is] regarded as atrocious and utterly intolerable in a civilized community." *Waldon*, 415 A.2d at 1076 (quoting Restatement (Second) of Torts § 46, comment d). While we do not necessarily commend defendants' treatment of Schoen, we cannot conclude that their actions amount, if anything, to more than "mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities"—to which liability does not extend. 415 A.2d at 1076. We grant summary judgment for defendants on this count.

## V. *Promissory Estoppel*

■ Plaintiff contends that the doctrine of promissory estoppel should bar defendants from reneging on their promise of lifetime employment with no salary reduction. In order to establish a claim for promissory estoppel, plaintiff must show that defendants made a promise (1) which they expected or should have reasonably expected would induce action of a definite and substantial character by Schoen, (2) which in fact induced such action, and (3) in circumstances requiring enforcement of the promise to avoid injustice. *Oates v. Teamsters Affiliates Pension Plan*, 482 F.Supp. 481 (D.D.C. 1979). Plaintiff is still employed and, more importantly, cannot show that defendants made any promise not to reduce his salary. As we have discussed, CUG never adopted such a policy. Without a formal declaration of corporate policy, CUG cannot be said to have promised anything.

The only "promise" of salary maintenance came too late. On November 4, 1983 the Board, acting without a quorum, resolved not to cut the salaries of demoted employees. Even if we accept plaintiff's argument that the frequent lack of a quorum estops defendants from claiming reliance on this resolution was unreasonable, Schoen could not have relied to his detriment on this promise. Several weeks earlier defendants had removed the last of Schoen's responsibilities and had told him to seek alternative employment. Effectively terminated at this point, Schoen could not claim he relied on a subsequent promise of no salary reduction.

## VI. *Fraud and Misrepresentation*

■ We grant summary judgment for defendants on plaintiff's claim of fraud and misrepresentation for the same reasons that we grant summary judgment on the promissory estoppel claim. Without a stated policy of maintaining employee's salaries, and without evidence of any such representations to Schoen, plaintiff has not offered a scintilla of evidence of fraud on the part of defendants.

## VII. *Breach of the Implied Covenant of Fair Dealing*

■ Finally, we grant defendants' motion for summary judgment on plaintiff's

claim that defendants breached the implied covenant of fair dealing. While a minority of jurisdictions recognize this cause of action, *see, e.g., Cancellier v. Federated Department Stores,* 672 F.2d 1312, 1318 (9th Cir.1982), *cert. denied,* 459 U.S. 859, 103 S.Ct. 131, 74 L.Ed.2d 113 (1982) (applying California law); *Mitford v. DeLasala,* 666 P.2d 1000 (Alaska 1983); *Fortune v. National Cash Register Co.,* 373 Mass. 96, 364 N.E.2d 1251 (1977), the District of Columbia has never joined this group. The facts of this case do not convince us to introduce a new cause of action as yet unrecognized in this jurisdiction, particularly where defendants were free to terminate at any time their at-will employment contract with Schoen.

### Conclusion

We do not doubt that defendants' actions have caused Schoen hurt, embarrassment and financial loss. Our role, however, is to award relief only where such injuries derive from unlawful conduct. With the exception of the second part of the retaliation claim, defendants have demonstrated the absence of any liability. We therefore grant summary judgment for defendants on all but that aspect of the retaliation count involving Schoen's removal as Secretary of the Board.

An order consistent with the foregoing has been entered this day.

### ORDER

Upon consideration of plaintiff's motion for summary judgment on Counts III and IX of the complaint and defendants' motion for summary judgment on all counts, the briefs and the record herein, and, for reasons set out in the accompanying memorandum opinion, finding with respect to Counts I through VIII and that portion of the claim in Count IX relating to the removal of plaintiff as Administrator of the Pension Plan and denial of facilities and training that there is no genuine issue as to any material fact and that defendants are entitled to judgment as a matter of law, it is by the court this 6th day of June, 1986,

ORDERED that with respect to Counts I through VIII and that portion of Count IX relating to the removal of plaintiff as Administrator of the Pension Plan and to denial of facilities and training, defendants' motion is granted and summary judgment shall be entered in favor of defendants, and it is

ORDERED that plaintiff's motions for summary judgment on Counts III and IX are denied, and it is

FURTHER ORDERED that with respect to plaintiff's claim of retaliation in his failure to be re-elected as Secretary of the Board of Trustees, defendants shall, within 30 days of the date of this order, file a motion for summary judgment, to which plaintiff shall have 10 days to respond.