**Robert Lee FRY, II, Appellant,**

v.

**DIAMOND CONSTRUCTION, INC., Appellee.**

No. 93–CV–1294.

District of Columbia Court of Appeals.

Argued April 26, 1995.
Decided June 1, 1995.

---

Marc Fiedler, with whom Roger C. Johnson and Lisa L. Riggs, Washington, DC, were on the brief, for appellant.

Samuel J. Smith, Jr., with whom William J. Carter and Thomas L. McCally, Washington, DC, were on the brief, for appellee.

Before FERREN, TERRY and SCHWELB, Associate Judges.

SCHWELB, Associate Judge:

Robert L. Fry II (Fry, Jr.) appeals from an order of the trial court granting Diamond Construction Company's motion for summary judgment in Fry, Jr.'s action for personal injuries. We conclude that there were genuine issues of material fact precluding entry of summary judgment. Accordingly, we reverse the judgment and remand the case for further proceedings.

## I.

Fry, Jr. suffered severe and disabling injuries when a ladder and scaffolding on which he was working collapsed, causing him to fall some thirty-two feet to the asphalt pavement below. At the time of the accident, Fry, Jr. was painting the exterior of a building at the Turner Elementary School in southeast Washington, D.C., as part of a project to replace windows at the school. Diamond was the general contractor retained by the District of Columbia for the project. Diamond had engaged Arlyn Construction Company, a sole proprietorship operated by Robert L. Fry, Sr., Fry, Jr.'s father, as the painting subcontractor for the work. Arlyn was to be compensated for its time and materials.

Under its agreement with Diamond, Arlyn was to paint the exterior structural columns which were located near the windows to be replaced. The Frys brought scaffolding to the site. After they had begun to set it up, they determined that the scaffolding was not high enough to enable Fry, Jr. to reach some of the windows.

Fry, Sr. testified at his deposition that on May 29, 1991, he went to see Bengt Barnas, Diamond's safety officer, to explain the situation. He informed Barnas that the top windows were too high to reach with the available scaffolding, and requested that he be authorized to use a "scissors lift." Barnas asked how much such a device would cost, and Fry, Sr. estimated that it would run about $200 to $250. According to Fry, Sr., Barnas rejected this option as too expensive. Fry, Sr. explained that without a scissors lift, he would have to place a ladder on top of the scaffolding, and Barnas directed him to do so. Although Diamond claims that Fry, Sr.'s testimony on this point was equivocal, the record does not bear out this contention:

Q Are you saying now you've got a recollection that he told you it was okay to use a ladder on top of the scaffolding?

A I didn't say I didn't have a recollection before. He told me to use the scaffold and the ladder....

Q Who originally suggested a ladder?

A I probably did. I told him that's the only way I could get up there. I couldn't run scaffolding any higher, but I told him I'd rather use the lift.

Q Is it possible he told you that he didn't want you to use the scaffolding and the ladder?

A It is not possible.

Q It's not possible?

A No.

\* \* \* \* \* \*

Q I'm trying to find out if you have a definitive and specific recollection that he said it was okay to use the scaffolding and ladder or if that's what you're assuming now?

A I'm not assuming anything. I can take a directive. I was given a directive. Now, how he made this directive, I don't know. I don't recall. All I know is when I left there, I had presented the problem, I told him the solution, what I wanted to do, and he told me it's too costly, to continue on as I was with the ladder and the scaffolding.

Barnas denied at his deposition that he had directed Fry to place a ladder on top of the scaffolding or that he had agreed to such a procedure. In fact, Barnas testified that such an arrangement would violate federal safety regulations and would increase "a thousand-fold" the risk that the worker would fall.[1]

The work proceeded on May 30, 1991. The dangerous situation created by the use of the ladder on the scaffold was compounded, according to Fry, Sr., by the fact that the scaffold was not "tied off" (*i.e.*, secured to the building).[2] Fry, Jr. was on the ladder, painting the top windows, when the accident occurred.

## II.

On May 4, 1992, Fry, Jr. filed a five-count complaint against Diamond.[3] In Count I, he alleged that Diamond had failed to provide him with a safe work environment. In Count II, he asserted that Diamond had negligently failed to provide adequate supervision of Arlyn's work. In a third count, Fry, Jr. claimed that Diamond had negligently employed Arlyn—his father's firm—to do the painting. In Count IV, Fry, Jr. alleged that the work performed by Arlyn was "inherently dangerous." In Count V, he asserted that the work involved a "peculiar risk of harm."

Diamond filed a motion for summary judgment. On July 23, 1993, the trial judge orally granted the motion. Before addressing the merits, the judge delivered a candid commentary on what he perceived to be the excessively complicated, confusing and irrational state of the appellate precedents (not identified by him) in this area of the law.[4] Turning to the substantive issues, the judge found that the activity in question was not inherently dangerous and that scaffolding "could never be made the basis of something being inherently dangerous."

The judge also emphatically rejected Fry, Jr.'s claims that the workplace was unsafe and that Diamond had failed adequately to carry out his alleged obligation to inspect it:

There was nothing about the work place that was unsafe ... It very simply was a wall of windows thirty feet above the ground. And I have already found that's how this building is constructed. That's

---

1. Fry, Sr. also testified that the use of the ladder on the scaffolding was dangerous. He said he felt obliged to proceed in this way because he had been directed to do so and because he had a family to feed.

2. Fry, Sr. testified that he was unable to find a way to tie off the scaffolding without defacing the building.

3. Fry, Jr. also joined the District of Columbia as a defendant. The trial judge granted the District's motion for summary judgment. The District is not a party to this appeal.

4. The judge said, in pertinent part:

I think perhaps the case authority in this area is far more complex than I'm about to make it. And to that extent I risk being wrong. But, frankly, when the law gets so complicated that it ceases to make sense, ... somebody has got to come on the scene to say so, and somebody has got to come on the scene to at least voice reality. It's just temporary. And I don't know who else can do that besides a trial judge.

I'm sworn to follow the law as it is enunciated by the District of Columbia Court of Appeals and I do so one hundred percent of the time. One hundred percent of the time. Even when in my eyes it ceases to make sense. I don't have to worry about that proposition in this case, however, because the law has been made so complicated in this area that there is no way of knowing frankly what the Court of Appeals will decide in this particular case on my ruling. And so try as I might to follow precisely what I think the Court of Appeals would want me to do in this case, try as I might, I risk, and it's a substantial risk, a failing in that endeavor because the law, again, in this area has become so complicated that it is not that clear. And it has ceased to make sense.

not inherently dangerous. So it is not Diamond that is leaving an unsafe work place for Robert Lee Fry, Senior. When Diamond goes to Robert Lee Fry, Sr., and says Robert Lee Fry, Sr. why don't you paint the frames of these windows for whatever time and materials somebody said. Fry doesn't—Diamond doesn't decide how the work is done, Fry does. Fry decides to put scaffolding up and then a ladder on top of the scaffolding and then sends Robert Lee Fry, II up the ladder to do the painting in the corner of this building. That is not an unreasonably safe work place. That's a very foolish employee working for a very foolish father who runs a very foolish company. And who shouldn't be taking on jobs that obviously he was never equipped to handle because he did not have the proper scaffolding to handle the job.

Diamond didn't force Robert Lee Fry, Sr. or Robert Lee Fry, II to take this job.... Diamond did not create the scaffolding ladder situation. Diamond, I find, was not obligated to have somebody out there every day making sure that Robert Lee Fry, Sr. or Robert Lee Fry, II didn't do something foolish in the process of what, painting.

\*　　\*　　\*　　\*　　\*　　\*

I am not impressed by the proposition that there might have been a conversation with a man named Barnas, Vice–President of Diamond, because the answer is a very simple one. You want a scissors lift, go out and get a scissors lift, Mr. Fry—he's not going to pay for the scissors lift because, frankly, we can go to a company that has the scissors lift if that's what we want, if that's what you need. And we don't need you—we don't need to pay for you to rent a scissors lift. I don't—there was nothing stopping the Frys from renting a scissors lift is what I'm saying here.

The judge added that if the law were to impose liability in this situation, then general contractors (and homeowners) would be made "absolute insurers of the work of all of their employers and all of their subcontractors." Fry, Jr. filed a motion to alter or amend the judgment. The judge denied the motion. This appeal followed.

### III.

This court, sitting en banc, recently reiterated the standard applicable to our review of orders granting summary judgment:

> In order to be entitled to summary judgment [the moving party] must demonstrate that there is no genuine issue of material fact and that [it is] entitled to judgment as a matter of law. Super.Ct.Civ.R. 56(c); *Clyburn v. 1411 K Street Limited Partnership*, 628 A.2d 1015, 1017 (D.C.1993). The record is viewed in the light most favorable to the party opposing the motion. *Graff v. Malawer*, 592 A.2d 1038, 1040 (D.C.1991). On appeal, we must assess the record independently, but the substantive standard applied is the same as that utilized by the trial court. *Northbrook Ins. Co. v. United Servs. Auto Ass'n*, 626 A.2d 915, 917 (D.C. 1993).

*Colbert v. Georgetown University*, 641 A.2d 469, 472 (D.C.1994) (en banc).

 Diamond accurately states in its brief that "the judge below assessed the testimony of Mr. Barnas and Mr. Fry, Sr., dismissing Mr. Fry, II's claims where the weight of the evidence favored the defendant Diamond Construction." Diamond adds that "[t]his [c]ourt should do likewise." But "the court may not resolve issues of fact or weigh evidence at the summary judgment stage." *Nader v. de Toledano*, 408 A.2d 31, 50 (D.C. 1979), *cert. denied*, 444 U.S. 1078, 100 S.Ct. 1028, 62 L.Ed.2d 761 (1980). "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of [the] judge.... The evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505, 2513, 91 L.Ed.2d 202 (1986). We are therefore powerless to follow Diamond's suggestion that we dismiss Fry, Jr.'s claims on the basis of any perception we may have of the "weight of the evidence."

 At oral argument, counsel for Diamond contended that Fry's apparently posi-

tive testimony that Barnas directed him to use the ladder on the scaffolding was ambiguous, especially when contrasted with Barnas' allegedly more forthright denials. But because the record is construed in the light most favorable to the non-moving party, *Colbert, supra,* 641 A.2d at 472, "the papers supporting the movant are closely scrutinized, whereas the opponent's are indulgently treated." *Bohn Aluminum & Brass Corp. v. Storm King Corp.,* 303 F.2d 425, 427 (6th Cir.1962) (citing 6 MOORE'S FEDERAL PRACTICE, § 56.11(1), at 2057).

Applying these principles to the record at hand, we must assume for purposes of the present appeal that Barnas refused to permit Fry, Sr. to rent a scissors lift, and ordered him instead to proceed with the scaffolding and ladder. We are obliged to disregard those of the trial judge's "findings" which are contrary to Fry, Sr.'s deposition testimony, *e.g.,* the judge's statement that "Diamond did not create the scaffolding ladder situation." [5] We now apply these principles to the evidentiary record before us.

## IV.

■ RESTATEMENT (SECOND) OF TORTS § 410 (1965) provides as follows:

### Contractor's Conduct in Obedience to Employer's Directions

The employer of an independent contractor is subject to the same liability for physical harm caused by an act or omission committed by the contractor pursuant to orders or directions negligently given by the employer, as though the act or omission were that of the employer himself.

This rule is simply "an application of the broader rule that one who either intentionally or negligently directs another to do or omit to do an act is subject to the same liability for the consequences of the other's act or omission as though it were his own." *Id.,* cmt. (a). Section 410 deals with "liability for negligence in directing work to be done which is dangerous in itself, *or dangerous because of the manner in which it is directed to be done.*" *Id., cmt. (a) (emphasis added).*

Section 410 has been invoked by the courts in numerous cases as authority for imposing liability upon the employer of an independent contractor where, as alleged here, the employer has directed that the work be done in a dangerous manner. *See, e.g., Williams v. Martin Marietta Alumina, Inc.,* 817 F.2d 1030, 1036–37 (3d Cir.1987); *Gonzalez v. United States Steel Corp.,* 248 Pa.Super. 95, 374 A.2d 1334, 1338–39 (1977), *aff'd,* 484 Pa. 277, 398 A.2d 1378, 1383–84 (1979); *Moloso v. State,* 644 P.2d 205, 216 (Alaska 1982); *see also* W. PAGE KEETON, PROSSER AND KEETON ON THE LAW OF TORTS, § 71, at 510 & n. 15 (1984) (citing RESTATEMENT).[6] Diamond does not contend that § 410 is an incorrect statement of the law, but claims that this provision protects only non-employee third parties, and may not be invoked by employees of the independent contractor.

---

5. In his oral decision, the judge also indicated that Fry, Sr. could have used a scissors lift if his company had been willing to pay for it. Fry, Sr. testified, however, that Barnas directed him to proceed with the "ladder and scaffolding" arrangement. There was no discussion about the possibility of Arlyn's using the scissors lift and paying for it. Specifically, Fry, Sr. did not testify, as the judge hypothesized, that Barnas said anything like "we can go to a company that has a scissors lift, if that is what we want."

In any event, the parties appear to be in disagreement as to whether Diamond or Arlyn would have been responsible for defraying the expense of a scissors lift under their "time and materials" contract. Fry, Jr. argues, for example, that Diamond would have been responsible for providing the lift pursuant to its statutory duty to "furnish and use safety devices and safeguards," D.C.Code § 36–228(a) (1989), and also under the terms of a provision in its own Construction Safety Program. We need not and do not reach these perceived issues, except to note that the record is not in a posture to warrant disposing of them by summary judgment.

6. In *Ellis v. Sheffield Gas Consumers Co.,* 118 Eng.Rep. 955 (1853), cited in PROSSER, *supra,* § 71 at 510 n. 15, the court upheld a verdict against the employer of an independent contractor who, at the employer's direction, had excavated a street and caused a nuisance which led the plaintiff to break her arm. Lord Chief Justice Campbell opined that "[i]t would be monstrous if the party causing another to do a thing were exempted from liability for that act, merely because there was a contract between him and the person immediately causing the act to be done." *Id.* at 956.

We do not agree with Diamond, for the authorities are uniformly to the contrary. *See, e.g., Williams, supra,* 817 F.2d at 1037:

> We have previously stated that [Section 410] applies when an employee of the independent contractor is injured. *Draper v. Airco, Inc.,* 580 F.2d 91, 101–02 (3d Cir. 1978). We relied on *Gonzalez v. United States Steel Corp., [supra],* where the Pennsylvania Superior Court held that an employer of an independent contractor could be liable under section 410 to the employee of an independent contractor injured by the collapse of bricks where the employer instructed the contractor to remove bricks from a wall.

The Supreme Court of Alaska has also explicitly rejected the theory here propounded by Diamond:

> [t]he theory of liability of § 410 ... is that of *personal* fault on the employer's part.... The engineer or architect owes a duty to the employees of an independent contractor to avoid endangering them by its own negligence. This includes using due care in the preparation of plans and specifications for the direction of the work. This duty is breached, that is, orders, plans, or directions are negligently given, if the employer knows or should know that the work to be done according to them involves an unreasonable risk of harm.

*Moloso, supra,* 644 P.2d at 216.[7]

█ If Fry, Sr.'s deposition testimony is credited, as it must be for purposes of a motion for summary judgment, Fry, Jr. has presented a genuine issue of material fact as to whether Diamond is liable pursuant to § 410 because it directed Arlyn to use the unsafe practice which resulted in Fry, Jr.'s injury. Barnas concededly knew of the peril. Indeed, Barnas testified that placing a ladder on top of the scaffolding "places the individual using it in extreme danger." Accordingly, the order granting summary judgment cannot be sustained.

### V.

Fry, Jr.'s case depends largely, if not entirely, on Barnas' alleged instruction to Fry, Jr. to use the scaffolding and ladder. Without evidence of that directive, most of Fry's claims would be significantly weakened. With Fry, Sr.'s testimony on that issue in the record, however, we conclude that it was error to grant summary judgment as to any of the counts in the complaint. Indeed, that testimony so dominates the issues before us that the five counts all but merge into a single claim.

### A. Safe Workplace.

█ As alleged in Count I, Diamond owed Fry, Jr. a duty to provide reasonably safe conditions of employment. *See generally Martin v. George Hyman Constr. Co.,* 395 A.2d 63, 70–71 (D.C.1978); D.C.Code §§ 36–221 *et seq.* (1988). This duty could not be carried out by directing Fry, Sr. to proceed

---

**7.** Diamond claims that in *Wagner v. Continental Cas. Co.,* 143 Wis.2d 379, 421 N.W.2d 835, 840–41 (1988), the Supreme Court of Wisconsin, in holding that the employee of an independent contractor injured while performing an inherently dangerous contract was not entitled to recover against the employer, discussed "all of the Restatement provisions which may have application (and which of course are argued here to have application by Mr. Fry II) and determined that there is no reference in the Restatement to employees." Diamond then asks us to adopt the reasoning of *Wagner* and to reject the decision in *Lindler v. District of Columbia,* 164 U.S.App.D.C. 35, 502 F.2d 495 (1974). In *Lindler,* the court held, in a well-reasoned opinion, that the District of Columbia was liable to third parties, including employees of an independent contractor, for injuries incurred in the performance by the contractor of inherently dangerous work. *Id.* at 38–40, 502 F.2d at 498–500.

An examination of the *Wagner* decision, a case in which three of the seven justice dissented, reveals that the plaintiff's claim was not based on an employer's negligent directive at all, and that § 410 was not discussed or even mentioned. *Lindler* is a unanimous decision which has defined the law of this jurisdiction for more than twenty years. *See, e.g., Meiggs v. Associated Builders, Inc.,* 545 A.2d 631, 636 (D.C.1988), *cert. denied,* 490 U.S. 1116, 109 S.Ct. 3178, 104 L.Ed.2d 1040 (1989), and *DiNicola v. George Hyman Constr. Co.,* 407 A.2d 670, 674 (D.C.1979) (both citing *Lindler* with approval). But even if we were disposed in an appropriate case to reject *Lindler* in favor of *Wagner*—and Diamond has not provided us with any persuasive reason to take such a step—then our hypothesized readiness to do so would have no application to the § 410 issue in this case.

with the subcontract in a manner which Barnas knew or should have known was unsafe. Barnas' knowledge that the procedure Fry, Sr. proposed to use was dangerous is not contested.

### B. Failure to Inspect and Supervise.

In Count II of the complaint, Fry, Jr. alleged that Diamond failed adequately to supervise Arlyn's work. The trial judge rejected this claim, commenting that Diamond was not required to "have somebody out there every day making sure that [the Frys] didn't do something foolish in the process of what, painting."

If, as Fry, Sr. testified, Barnas knew that Fry, Sr. proposed to use an unsafe method of performing the work, Diamond's responsibility to conduct regular inspections of the job site, see generally 29 C.F.R. §§ 1926.32(k), 1926.20(b)(1)(2), could not be carried out simply by ordering Fry, Sr., in advance of the first inspection, to go ahead with the ladder and scaffolding arrangement.[8] The purpose of the requirement of inspection and supervision is to prevent unsafe practices, not to authorize or even direct a subcontractor to engage in them.

### C. Negligent Hiring or Retention.

In Count III of his complaint, Fry, Jr. alleged that Diamond failed to ensure that Arlyn was competent to conduct safely the work it was hired to perform. The trial judge did not address this allegation.

There is little, if any, basis in this record for finding that Diamond was negligent in initially retaining Arlyn. It is undisputed that Barnas had worked successfully with Fry, Sr. on previous occasions, albeit on projects which did not require painting at heights of thirty-two feet. As the court explained in Sievers v. McClure, 746 P.2d 885 (Alaska 1987), "it is unreasonable to expect the employer to make specific inquiries into the many details of the projects, and the safety procedures for each, when the employer has been reasonably assured of the contractor's general reputation for, and past history of, safety and competent work." Id. at 891.[9] "[A] contractor's negligence in conducting the work it was hired to do creates no presumption that the employer was negligent in selecting the contractor.... One incident of poor judgment does not prove incompetence." Sullivan v. St. Louis Station Assocs., 770 S.W.2d 352, 356 (Mo.App. 1989) (citations omitted). In this area of the law, as in others, courts must "make every effort to eliminate the distorting effects of hindsight." See Strickland v. Washington, 466 U.S. 668, 689, 104 S.Ct. 2052, 2065, 80 L.Ed.2d 674 (1984).

■ But an employer has "the legal duty to use ordinary care so as not to employ or retain an independent contractor-carrier it knew or should have known was ... negligent in performing the contract." Jones v. Southwestern Newspapers Corp., 694 S.W.2d 455, 458 (Tex.App.1985) (emphasis added). Crediting, as we must for present purposes, Fry, Sr.'s deposition testimony that he told Barnas that he was using a procedure known by Barnas to be dangerous, we conclude that Barnas "was in duty bound to investigate whether [Arlyn] in fact was competent and properly equipped to continue in the work and to take steps to avert any existing peril if [Arlyn] were not competent, or improperly equipped to carry on the work." Kuhn v. P.J. Carlin Constr. Co., 154 Misc. 892, 278 N.Y.S. 635, 644 (Supreme Ct.Bronx Co.1935). A genuine issue of material fact was thus presented as to whether Diamond was negligent in continuing to use Arlyn as its subcontractor after the "scaffolding and ladder" arrangement had been brought to Barnas' attention.

---

**8.** Diamond's own Construction Safety Program also required it to conduct daily safety inspections of the site. Diamond claims that the accident occurred before the first scheduled inspection. Assuming, without deciding, that this was so, an impartial trier of fact could reasonably find that the conversation between Fry, Sr. and Barnas, as related by Fry, Sr., required Diamond to accelerate its inspection schedule in order to avert an obvious peril.

**9.** The court also held in Sievers, a case on which Diamond relies, that the employer's duty of due care in the selection of an independent contractor runs in favor of the contractor's employees.

*D. Inherent Danger and Peculiar Risk of Harm.*

In Counts IV and V of his complaint, Fry, Jr. alleged that the work to be done was inherently dangerous and exposed him to a peculiar risk of harm. An employer is liable for injuries caused by the negligence of an independent contractor where the work performed by the contractor is inherently dangerous. *Levy v. Currier,* 587 A.2d 205, 209 (D.C.1991); *Lindler, supra,* note 7, 164 U.S.App.D.C. at 38, 502 F.2d at 495 (applying this rule in favor of independent contractor's employee). The trial judge, as we have seen, held that scaffolding and painting are not inherently dangerous activities.[10]

But the application of the "inherent danger" rule is not limited to intrinsically hazardous work. *District of Columbia v. Howell,* 607 A.2d 501, 505 (D.C.1992). On the contrary, the rule applies, *inter alia,* where "the employer has special reason to contemplate such a risk [of harm] under the particular circumstances under which the work is to be done." *Levy, supra,* 587 A.2d at 209 (quoting RESTATEMENT (SECOND) OF TORTS § 427, cmt. b (1965)). In the present case, Barnas testified that he was well aware of the danger posed by the "scaffolding and ladder" procedure. According to Fry, Sr., Barnas not only tolerated the perilous methodology but actually directed Fry, Sr. to follow it.

"Whether a particular kind of work is inherently dangerous is essentially a relative determination based upon the facts of the particular case." *Taylor v. Tellez,* 610 A.2d 252, 255 (D.C.1992) (citations omitted). "The existence of [a] danger and knowledge of it by the employer are normally questions of fact for the jury." *Howell, supra,* 607 A.2d at 505. Given Fry, Sr.'s testimony, there were genuine issues of material fact precluding entry of summary judgment on Fry, Jr.'s claim of "inherently dangerous" activity. For similar reasons, we conclude that summary judgment was improperly entered on Fry, Jr.'s related claim under the "peculiar risk" doctrine. *See Wilson v. Good Humor Corp.,* 244 U.S.App.D.C. 298, 309, 757

F.2d 1293, 1304 (1985); RESTATEMENT (SECOND) OF TORTS, § 413 cmt. b (1965).

## VI.

The judgment of the trial court is reversed, and the case is remanded for further proceedings consistent with this opinion.

*So ordered.*

---

10. "Courts have consistently held that working on scaffolding ... is not an inherently dangerous activity." *Jennings v. United States,* 530 F.Supp. 40, 45 (D.C.1981) (citations omitted).