**Charlotte R. BLOUNT, Appellant,**

v.

**NATIONAL CENTER FOR TOBACCO–FREE KIDS,**
**Appellee.**

**No. 98–CV–1923.**

District of Columbia Court of Appeals.

Argued April 5, 2000.
Decided July 5, 2001.

Lathal Ponder, Jr., for appellant.

Thomas C. Mugavero, for appellee.

Before WAGNER, Chief Judge, and SCHWELB and WASHINGTON, Associate Judges.

PER CURIAM:

Charlotte R. Blount, a black woman, brought this action against her former employer, the National Center for Tobacco–Free Kids (NCTFK or the Center), alleging that she was discharged on account of her race, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq.* (1994). NCTFK filed a motion for summary judgment, which the trial judge granted in a twelve-page written order. Ms. Blount now appeals. Although the evidence of discrimination may not be viewed as substantial, we conclude that it is sufficient to survive summary judgment. Accordingly, we reverse.

## I.

### FACTUAL BACKGROUND

Ms. Blount was hired as NCTFK's Director of Constituency Relations in June 1996, and she began working for the Center on July 15 of that year. She had previously served for fifteen years as Director of External Programs with Edison Electric Institute, and she had also worked, *inter alia*, as a broadcast journalist and a university professor. As the trial judge noted in his order granting summary judgment, NCTFK officials must have believed, at the time of hiring, that Ms. Blount was qualified for her new position.

NCTFK was a comparatively small operation, and the three other directors, as well as all of the Center's professional staff members, were white; an undisclosed number of "administrative assistants" apparently were non-white. William D. Novelli, NCTFK's president, testified that the organization was attempting to recruit members of minority groups and that "we had diversity as an objective."

Ms. Blount's career with the Center was short-lived. She was discharged in October 1996, while still serving as a probationary employee; NCTFK claims that the discharge was for poor job performance. NCTFK advised Ms. Blount in her termination letter "that your skills and the

needs of the National Center for the person in your position do not fit well."

In opposition to NCTFK's motion for summary judgment, Ms. Blount alleged that she had been discriminatorily treated in a number of ways. She claimed, *inter alia,*

1. that NCTFK failed to back her up when she had difficulties with an allegedly uncooperative white subordinate, Judith S. Glanz;[1]

2. that she was not introduced to representatives of constituent organizations, such introductions being essential for her job performance, and that she was excluded from meetings and activities which other (white) directors were permitted to attend;[2] and

3. that unlike other directors, she was not given an adequate staff to perform her work.

Ms. Blount further asserted that NCTFK was markedly unenthusiastic about, and altogether unreceptive to, her proposals to involve black and other minority public figures, including golfer Tiger Woods, gymnast Dominique Dawes, and former Surgeon General Jocelyn Elders, in its outreach campaign. According to Ms. Blount, "every effort that I made to recommend a broader scope [for African–American involvement] was ignored or virtually laughed at," or met with derision. Ms. Blount also claimed that, prior to her discharge, she had not been advised by her superiors that her work was unsatisfactory. Based on what she regards as discriminatory treatment during her brief sojourn at the Center, Ms. Blount claims that her termination was also based on her race.

In support of its motion for summary judgment, NCTFK relied on testimony to the effect that Ms. Blount performed poorly in a number of respects. One of Ms. Blount's early responsibilities at NCTFK was to prepare a strategic plan to develop and strengthen constituency relationships. The plan initially drafted by Ms. Blount was very general and, from NCTFK's perspective, completely inadequate; when Ms. Blount failed to present a satisfactory replacement plan in timely fashion, this ultimately became, in Mr. Novelli's words, "the straw that broke the camel's back." Ms. Blount's testimony suggests that she initially was under a misapprehension as to the kind of strategic plan that her superiors had requested, and that she subsequently prepared a plan more focused on NCTFK's specific mission.

Mr. Novelli and NCTFK's Vice–President, Matthew L. Myers, also claimed to have received a number of complaints from NCTFK's constituent groups to the effect that Ms. Blount would speak out on issues on which she lacked relevant knowledge,[3] that she did not understand or appreciate

---

1. Ms. Glanz was an experienced employee who had herself sought the position for which Ms. Blount was hired.

2. Ms. Blount testified that she was not permitted to attend an important ceremony at the White House, although Judith Glanz, the subordinate with whom Ms. Blount was having difficulty, was the liaison contact with the White House and was invited to attend. Ironically, according to Ms. Blount, it was Ms. Glanz who advised Ms. Blount that Ms. Blount could not go.

3. NCTFK worked closely with a number of other organizations, including the American Heart Association and the American Cancer Society, that had long been involved in the tobacco wars. Mr. Myers testified that

on at least two occasions I received phone calls from the director of Government Relations for the American Heart Association; and on one or more occasions similar phone calls [from] the chief lobbyist for the American Cancer Society, that in their interactions with Charlotte [Blount], she had treated them as if they had never had anything to do with tobacco control in their history before, as if they had no prior relationship with the Center or any of the people.

the need for close cooperation with these organizations, and that she failed to develop a grasp for issues relating to tobacco control.[4] Further, it was NCTFK's position that, although (in the words of Mr. Myers) Ms. Blount had "excellent interpersonal skills," her rigorous and hierarchical management style made it difficult for her, in the more informal and free-wheeling atmosphere at the Center, to relate effectively to subordinates,[5] two of whom requested not to have to work with her. Finally, in response to Ms. Blount's claims of discriminatory treatment, NCTFK argued that most of her allegations were conclusory in nature, that any restrictions placed on Ms. Blount's contacts with constituent groups were based on her impru-

dent conduct and comments, and that the record was devoid of evidence that any action taken by NCTFK with respect to Ms. Blount was racially motivated.

The trial judge granted NCTFK's motion. In the judge's view, "[b]ecause conclusory allegations are insufficient to create a genuine issue of material fact which precludes summary judgment, this [c]ourt finds that Plaintiff failed to prove that she was qualified for the job." (Quotation marks and citations omitted.) The judge concluded that Ms. Blount "provides no proof that [her] treatment was in fact disparate, much less that her race was the reason." Noting Ms. Blount's admission "that the strategic plan she prepared was very generic and that she knew it was not

> You need to understand the cancer— those two organizations are two of our prime funders ... who have been the leaders in this movement for years and years and years.

Mr. Myers also stated that a day after a strategic planning session with other anti-smoking groups, which took place shortly after Ms. Blount had been hired, but before she had actually started working at NCTFK, the following occurred:

> Mike Pertschuk, former chairman of the Federal Trade Commission[,] now a director of an organization called the Advocacy Institute, pulled me aside and did something that he had never done in the 18 years I have known him. He said to me that he had met Charlotte the day before, that she was obviously articulate and personable[,] but he had graver concerns about her than he had with anyone else and hoped we hadn't made a mistake.
>
> I asked him why. And he said that she had sat down at a table with people who had been doing tobacco[-]related work for years and began expressing very strong opinions on issues [about which] she appeared to have very little knowledge; and that she on several occasions had taken the conversations off in a very skewed manner; that she had not been a willing listener and that that caused him concern. That caused me concern because of the source.
>
> Mike Pertschuk is one of the most open[-]minded people who not only enjoys

> but thrives on meeting new people and encountering new ideas of anyone I've ever met. He is very rare to criticize people. At the time, as a rule, all I did was listen and say I hope he was wrong because I had been impressed with Charlotte during the interview process.

There is no evidence, and indeed Ms. Blount has not alleged, that Ms. Blount's critics from other organizations were acting out of racial bias.

Mr. Novelli testified that at a meeting before she actually came on board (probably the same meeting that Mr. Pertschuk attended), Ms. Blount immediately

> began to speak and it became clear to me that she didn't know what she was talking about. Not about the issues at hand, nor seemingly about the process of constituency relations. That's when my worries began.

4. According to Ms. Blount, Mr. Myers advised her that he had received one such criticism of her allegedly imprudent remarks. Ms. Blount inquired as to the source and specifics of the criticism, so that she could "clear the air." In response, Mr. Myers told her "not to worry about it."

5. According to Mr. Novelli, he had been told that Ms. Blount's difficulties with Ms. Glanz "had permeated throughout the office and ... [were] really affecting morale."

a specific plan for [NCTFK]," the judge opined that "[i]nadequate performance is a legitimate basis for dismissal." Finally, according to the judge, Ms. Blount had failed to prove that her discharge was pretextual:

> Plaintiff was hired and fired by the same individuals. Mr. Myers and Mr. Novelli obviously realized Plaintiff was African–American when they hired her, which defies the inference that they would fire her three months later for the exact same reason they, according to the Plaintiff, hired her. "Employers who knowingly hire workers within a protected group seldom will be credible targets for charges of pretextual firing." *Proud v. Stone,* 945 F.2d 796, 798 (4th Cir. 1991); *see also Bradley [v. Harcourt, Brace & Co.],* 104 F.3d [267,] 270 [(9th Cir.1996)]; *Lowe v. J.B. Hunt Transport, Inc.,* 963 F.2d 173, 174–75 (8th Cir.1992).

(Internal alterations omitted.)

This appeal followed.

## II.

## LEGAL ANALYSIS

A. *Summary judgment standard.*

▇ In order to be entitled to summary judgment, NCTFK must demonstrate that there is no genuine issue of material fact and that NCTFK is entitled to judgment as a matter of law. Super.Ct.Civ.R. 56(c); *Colbert v. Georgetown Univ.,* 641 A.2d 469, 472 (D.C.1994) (en banc). The record must be viewed in the light most favorable to the party opposing the motion. *Graff v. Malawer,* 592 A.2d 1038, 1040 (D.C.1991). "[T]he papers supporting the movant are closely scrutinized, whereas the opponent's are indulgently treated." *Fry v. Diamond Constr., Inc.,*

659 A.2d 241, 246 (D.C.1995) (quotation marks and citations omitted). As the Supreme Court explained in *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986),

> [c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of [the] judge.... *The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor.*

(Emphasis added.) *See also Fry, supra,* 659 A.2d at 245. The determination of a defendant's state of mind presents a question of fact, and where, as in the present case, the dispositive issue turns on the existence, *vel non,* of a prohibited motive, summary judgment is rarely appropriate. *E.g., Nickens v. Labor Agency of Metro. Washington,* 600 A.2d 813, 820 (D.C.1991).[6]

Moreover, we are dealing here with a complaint of alleged racial discrimination. As we recently stated in *Carter–Obayuwana v. Howard Univ.,* 764 A.2d 779, 787 (D.C.2001),

> "[t]he right to equal opportunity without discrimination based on race or other such invidious ground[, including sex,] is protected by a policy to which both this nation and its capital city have accorded the highest priority." *Harris v. District of Columbia Comm'n on Human Rights,* 562 A.2d 625, 626 (D.C.1989) (internal quotation marks omitted) (quoting *Trafficante v. Metro. Life Ins. Co.,* 409 U.S. 205, 211, 93 S.Ct. 364, 34 L.Ed.2d 415 (1972)). "It is especially in civil rights disputes that we ought to be chary of disposing of [cases]" on the pleadings, for "courts do in fact have a predilection for allowing civil rights cases to proceed until a comprehensive record is available to either support or

---

**6.** We have stated that "the test for deciding a motion for summary judgment is essentially the same as that for a motion for a directed

verdict." *Beard v. Goodyear Tire & Rubber Co.,* 587 A.2d 195, 199 (D.C.1991) (citations omitted).

negate the facts alleged." *Sisters of Providence v. City of Evanston*, 335 F.Supp. 396, 399–400 (N.D.Ill.1971). Civil rights statutes are accorded a "generous construction" to ensure their "vitality." *Trafficante, supra*, 409 U.S. at 212, 93 S.Ct. 364; *see also Wallace v. Skadden, Arps, Slate, Meagher & Flom*, 715 A.2d 873, 889 (D.C.1998).

B. *Prima facie case.*

 The analysis of a claim of racial discrimination in employment is governed by the standards set forth by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973).

> Under the *McDonnell Douglas* framework, a plaintiff bears the initial burden of producing evidence to sustain a prima facie case. If the plaintiff meets this burden, the employer must then produce evidence of a legitimate, nondiscriminatory reason for his action. If the employer offers a legitimate, nondiscriminatory reason, the burden then shifts back to the plaintiff to present evidence that the employer's proffered reason is pretextual. The ultimate burden of persuasion rests with the plaintiff to show impermissible motive or intent.

*Johnson v. Zema Sys. Corp.*, 170 F.3d 734, 742 (7th Cir.1999) (citation omitted). In order to establish a *prima facie* case of discriminatory discharge, Ms. Blount must demonstrate

that (1) she belongs to a protected class; (2) that she was qualified for the job from which she was terminated; (3) that her termination occurred despite her employment qualifications; (4) and that her termination was based on the characteristic that placed her in the protected class.

*Blackman v. Visiting Nurses Ass'n*, 694 A.2d 865, 868–69 (D.C.1997) (citations omitted).

 This case is a very close one with respect to the second, third, and fourth of these elements, for NCTFK has presented a nondiscriminatory explanation of its decision to discharge Ms. Blount, namely, that she proved to be unqualified to perform her duties effectively. But close cases must be decided and, in our view, an impartial trier of fact, crediting all of Ms. Blount's testimony, and drawing every reasonable inference in her favor, could find for Ms. Blount with respect to each of the final three elements, and could rationally conclude that race was an appreciable factor[7] in Ms. Blount's discharge. Ms. Blount evidently had an excellent record at Edison Electric Institute[8] and, according to her, she was never told, prior to her discharge, that her performance was unsatisfactory. Ms. Blount acknowledged, albeit with some ambivalence, that her superiors did not make racially derogatory comments to her face,[9] but such evidence

---

7. There is "no acceptable place in the law for partial racial discrimination." *Tursio v. United States*, 634 A.2d 1205, 1213 n. 7 (D.C.1993) (quoting *Smith v. Sol D. Adler Realty Co.*, 436 F.2d 344, 350 (7th Cir.1971)).

8. This alone might be deemed sufficient to satisfy *McDonnell Douglass'* second qualification prong. *See EEOC v. Horizon/CMS Healthcare Corp.*, 220 F.3d 1184, 1193 (10th Cir.2000) (holding that an employee is required only to "introduce[ ] some evidence that she possesses the objective qualifications

necessary *to perform the job* ") (emphasis in original). We note, however, that there is also authority to the contrary. *See, e.g., Zema Sys. Corp., supra*, 170 F.3d at 743 (plaintiff must show "that he was meeting [his employer's] legitimate performance expectations").

9. Ms. Blount did state on deposition that, on one occasion, when she was discussing the difficulties that she was having with Ms. Glanz, Mr. Myers commented that it was "too bad I wasn't [J]ewish." Whatever the sentiment behind Mr. Myers' statement may have

obviously cannot be required,[10] and the jury might arguably draw some limited inference from the cool reception Ms. Blount claims to have received for her suggestions that black and other minority celebrities be used in NCTFK's community outreach programs.

We acknowledge that, on this record, there was also evidence that NCTFK's purpose was nondiscriminatory.[11] But crediting, as we must for present purposes, all of Ms. Blount's allegations, and drawing all reasonable inferences in her favor, we conclude that Ms. Blount presented a sufficient prima facie case under *McDonnell Douglas* to preclude an award of summary judgment, and that NCTFK has failed to satisfy its heavy burden of establishing the contrary.

C. *"Legitimate, nondiscriminatory reason."*

 Ms. Blount having satisfied the *prima facie* case requirement, NCTFK must offer a legitimate nondiscriminatory reason for discharging Ms. Blount. This is

a burden of production, not of persuasion. *E.g., Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 142, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000). NCTFK has satisfied this burden by presenting evidence that Ms. Blount was fired on account of her allegedly unsatisfactory performance, as detailed above.

D. *Pretextuality.*

NCTFK having offered a valid nondiscriminatory justification for discharging Ms. Blount, the plaintiff can prevail only if she is able to demonstrate that the Center's stated reasons were in fact pretextual. This may not be an easy task, since, as also pointed out by the trial court, "employers who knowingly hire workers within a protected group seldom will be credible targets for charges of pretextual firing." *Proud, supra,* 945 F.2d at 798.

 But Ms. Blount's theory appears to be that NCTFK officials hired her in the hope that she would give them the "cover" of having a black director, but then

---

been, Ms. Blount obviously did not appreciate it. She also testified that racially-biased statements were not made "openly to my face, but I just wasn't included in anything. I was never acknowledged in public settings." She explained that "I knew that something didn't feel right, but I just didn't really know what it was."

10. Even in the then embattled state of Mississippi seventeen [now twenty-eight] years ago, "most persons would not admit publicly that they entertain any bias or prejudice against members of the Negro race." *United States v. Real Estate Development Corp.,* 347 F.Supp. 776, 783 (N.D.Miss.1972), quoting from *Dailey v. City of Lawton,* 296 F.Supp. 266, 268 (W.D.Okla.1969), *aff'd* 425 F.Supp. 1037 (10th Cir.1970). As the appellate court aptly observed in *Dailey, supra,* in the analogous context of racial discrimination by a public agency:

If proof of a civil rights violation depends on an open statement by an official of an

intent to discriminate, the Fourteenth Amendment offers little solace to those seeking its protection.
425 F.2d at 1039.
*Harris v. District of Columbia Comm'n on Human Rights,* 562 A.2d 625, 631 (D.C.1989) (internal alterations omitted). This reasoning applies with equal force to suits against private employers under Title VII.

11. NCTFK argues that Ms. Blount's performance was severely criticized by important members of the anti-smoking coalition. In addition, according to NCTFK, junior employees found it difficult to work for her, and it appears that morale in the office may have been unfavorably affected by Ms. Blount's conflict with Ms. Glanz. There is no evidence that representatives of the American Heart Association or of the American Cancer Society, or former FTC Chairman Pertschuk (or, for that matter, the two NCTFK employees who objected to Ms. Blount's allegedly hierarchical management style) spoke or acted out of racial prejudice.

they decided to fire her because she proved to be an assertive proponent of black participation in community outreach, rather than a docile employee who would not make waves. Although record support for this proposition is somewhat thin, an impartial trier of fact might arguably resolve the issue in Ms. Blount's favor if he or she credited all of Ms. Blount's testimony and disbelieved NCTFK's allegations regarding Ms. Blount's performance.[12]

Given the summary judgment standard, the nature of the action, and the centrality of the factual issue relating to the state of mind of NCTFK's representatives, we conclude that NCTFK has failed to satisfy its formidable burden under Super. Ct. Civ. R. 56.

### III.

### CONCLUSION

For the foregoing reasons, the judgment is reversed, and the case is remanded to the trial court for further proceedings consistent with this opinion.

*So ordered.*[13]

---

12. We note that NCTFK did not file affidavits by any of the representatives of constituent organizations whose complaints about Ms. Blount were considered by Mr. Novelli and Mr. Myers in reaching their decision to terminate her. This issue may be more amenable to resolution on the basis of a full evidentiary record from which the trier of fact can ascertain, in greater depth and detail, precisely what occurred.

13. As an alternative ground for summary judgment, NCTFK has argued that the action is barred under the doctrine of accord and satisfaction. The trial judge did not reach this issue, and we decline to address it for the first time on appeal. Instead, we leave the accord and satisfaction claim to the trial court for disposition on remand.