Katherine T. WALLACE, Appellant,

v.

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP, et al., Appellees.

Nos. 00–CV–844, 00–CV–1168, 00–CV–1330.

District of Columbia Court of Appeals.

Argued April 11, 2002.

Decided May 30, 2002.

Katherine T. Wallace, pro se.

Barbara Berish Brown, with whom Neal D. Mollen and Abbey G. Hairston were on the brief, Washington, DC, for appellees.

Before STEADMAN and REID, Associate Judges, and BELSON, Senior Judge.

REID, Associate Judge:

These are consolidated cases involving an action for discrimination brought by appellant Katherine T. Wallace, Ph.D, against her former law firm and individual partners of the firm, appellees Skadden, Arps, Slate, Meagher & Flom LLP ("Skadden") and Antoinette Cook Bush, Thomas J. Casey, and Neal S. McCoy (collectively "appellees"). Dr. Wallace appeals from the grant of summary judgment in favor of appellees on her discrimination complaint (No. 00–CV–1168), and from judgments relating to costs awarded to appellees (Nos. 00–CV–844 & 00–CV–1330).[1] We affirm.

## FACTUAL SUMMARY

Dr. Wallace's background and part of the history of this case are set forth in

*Wallace I* and need not be repeated. Suffice it here to highlight only a few salient facts.[2] Dr. Wallace began work at Skadden on September 7, 1993. She was assigned to Skadden's International Trade Group. After Dr. Wallace encountered problems in that practice group, she was transferred to the Communications Group where she worked until she was terminated on September 20, 1995.

Following her termination, Dr. Wallace filed a defamation complaint against Skadden and others in November 1995, followed by a discrimination complaint in September 1996. Her discrimination complaint contained four counts: (1) discrimination in compensation based on race and marital status (married and the mother of three children) in that she was denied a full mid-year discretionary bonus; (2) discrimination in the terms and conditions of employment because her ninety-day probation status was discriminatory and pretextual based on race and marital status; (3) discriminatory discharge conducted in a manner to humiliate her because of her race and marital status; and (4) discrimination traceable to Skadden's refusal to refer her for other employment, which deprived her of employment opportunities because of her race and marital status.

Eventually, appellees filed a motion for summary judgment on the discrimination complaint in September 1999, and Dr. Wal-

---

1. The costs related not only to the discrimination case, but also to a defamation case filed by Dr. Wallace. The early history of these cases is delineated in *Wallace v. Skadden, Arps, Slate, Meagher & Flom LLP*, 715 A.2d 873 (D.C.1998) (*Wallace I* ). *Wallace I* resulted in a remand of part of the case to the trial court. After remand, the trial court granted summary judgment not only in the discrimination case, but also in the defamation case. Costs awarded in the discrimination case amounted to $1,500.00 and totaled $7,342.72 in the defamation case. Dr. Wallace noted an

appeal in the defamation action, but later entered into a stipulation to dismiss the appeal relating to the defamation action. Thus, the consolidated cases concern the summary judgment motion in the discrimination action, and the judgment of costs awarded to appellees in both the discrimination and defamation matters.

2. Other facts will be detailed in the analysis section of this opinion.

lace filed an opposition.[3] The trial court issued an order granting defendants/appellees' summary judgment motion on Dr. Wallace's discrimination complaint. In essence, the trial court found that there was a "lack of evidence upon which a jury could reasonably conclude that [defendants/appellees'] 'for cause' explanations were a pretext for discrimination based on plaintiff's race and/or marital status . . . ." Specifically, the trial court concluded, in part:

> The evidentiary record before the court is replete with examples of the numerous ways in which plaintiff's work product and attitude did not satisfy the rigorous standards mandated by the Firm. Of particular significance is the fact that plaintiff does not contest that she received several negative or "mixed" reviews and made errors in performing the tasks assigned . . . . Moreover, the explanations plaintiff offers to excuse her repeated failure to meet deadlines, reluctance to work the hours required, typographical and substantive errors, insubordinate attitude toward superiors, inability to take criticism and failure to meet client expectations do not give rise to the requisite showing of pretext sufficient to rebut defendants' stated legitimate business reasons. Furthermore, plaintiff's contention that defendants' unreasonable performance expectations give rise to an inference of pretext is undermined by her own deposition testimony in an unrelated case. Plaintiff was asked:

Did you think any aspect of your evaluation in the summer of 1995 was unfair because of your race?[To which she responded] No. Toni Cook Bush, [one of the three-named partner defendants,] is black. I don't think that she was. She does everything she can to try and protect me and give me whatever advice she can give me. So I take from her that there was a true concern, whether or not it is something that was procedural or substantive, that is something that I have to deal with and that I can effectively deal with just by tightening up my office procedures.

In a footnote, the trial court stated that although the focus of its order was the pretext issue, Dr. Wallace failed to satisfy the fourth element of a *prima facie* discrimination case.

Later, in response to Skadden's motion for costs in both the defamation and discrimination actions, the trial court awarded only a portion of the amount requested: $1,500.00 in defamation costs compared with the demand for $7,282.72, and $7,342.72 in the discrimination action instead of the requested $22,226.23.

Dr. Wallace filed timely appeals.

## ANALYSIS

### Dr. Wallace's Discrimination Complaint

Dr. Wallace asserts that the trial court erred in granting appellees' motion for summary judgment on her discrimination

---

3. The motion was accompanied by a twenty-one page "Statement of Undisputed Material Facts in Support of [Defendants/Appellees'] Motion for Summary Judgment," as well as a memorandum of points and authorities, and approximately thirty exhibits, including declarations and depositions of current and former Skadden partners, associates, and other personnel, and evaluations of Dr. Wallace's performance at Skadden. In October 1999, Dr.

Wallace filed a thirty-page memorandum of points and authorities in opposition to defendants/appellees' motion for summary judgment, but we have been unable to find in the record before us a separate statement of material facts in dispute. Some of the "undisputed" facts set forth in Skadden's separate statement of undisputed facts, however, are disputed in Dr. Wallace's memorandum of points and authorities.

complaint because: (1) she established a *prima facie* case based on race and marital status; (2) the evidence presented by her is sufficient to raise an inference of discrimination based on race and marital status; and (3) the manner of her termination from Skadden was discriminatory. Summary judgment is appropriate when there are no genuine issues of material fact to be resolved, and a party is entitled to judgment as a matter of law. *See Colbert v. Georgetown Univ.*, 641 A.2d 469, 472 (D.C. 1994) (en banc); Super. Ct. Civ. R. 56(c). To assess whether summary judgment was proper, we review the case *de novo. Id.* (citation omitted). In the final analysis, "[a] motion for summary judgment should be granted only if '(1) taking all reasonable inferences in the light most favorable to the nonmoving party, (2) a reasonable juror, acting reasonably, could not find for the nonmoving party, (3) under the appropriate burden of proof.'" *Fred Ezra Co. v. Psychiatric Inst. of Washington, D.C.,* 687 A.2d 587, 591 (D.C.1996) (quoting *Sherman v. District of Columbia,* 653 A.2d 866, 869 (D.C.1995) (quotation omitted)) (alteration in original).

Here, Dr. Wallace's first burden was to establish a *prima facie* case of discrimination based on race and marital status by showing that: (1) she belongs to a protected class; (2) was qualified for the job from which she was terminated; (3) her termination, and the alleged adverse employment practices surrounding it, occurred despite her employment qualifications; and (4) her termination was based on the characteristic that placed her in the protected class. *See Blackman v. Visiting Nurses Ass'n,* 694 A.2d 865, 868–69 (D.C. 1997). If Dr. Wallace meets her burden to establish a *prima facie* case, the burden shifts to appellees to articulate a legitimate, non-discriminatory basis for Dr. Wallace's termination. *Id.* at 868. If ap-

pellees meet their burden, Dr. Wallace must then show that the appellees' action was pretextual. Dr. Wallace retains the ultimate burden of persuasion. *Id.* at 868.

The trial court noted that Dr. Wallace failed to satisfy the fourth requirement with respect to a *prima facie* case, that is, to demonstrate that appellees' alleged adverse employment practices and her termination were based on her race and marital status. On appeal, Dr. Wallace argues that she is not required to satisfy the four-part test reiterated in *Blackman, supra.* Rather, citing *Schoen v. Consumers United Group, Inc.,* 670 F.Supp. 367, 372 (D.D.C.1986), Dr. Wallace maintains that she needs only to "demonstrate facts sufficient to create a reasonable inference that [] discrimination was a 'determining factor' in the employment decision." While Dr. Wallace sets forth the legal principle applied in *Schoen,* she does not acknowledge that the trial judge there began his analysis with the four-part test reiterated in *Blackman, supra.* Significantly also, the trial court in *Schoen* declared that the facts required by the legal principle articulated in that case "could be either direct evidence of discrimination or statistical evidence of disparate treatment." *Schoen, supra,* 670 F.Supp. at 373 (references omitted). Here, Dr. Wallace relies on indirect evidence or inferences of alleged discrimination, and "has presented no statistical evidence to show a pattern or practice of [race or marital status] discrimination by defendants[/appellees]." *Id.* Instead, she places great emphasis on the fact that two white, childless associates were hired after she was terminated. However, the record shows that the offer to one of these individuals, who worked for Skadden as a 1994 summer associate, was extended one year before Dr. Wallace was terminated. An offer was made to the other person soon after his resume was received in May 1995, also before Dr. Wallace left Skadden.

■ Even assuming that Dr. Wallace established a *prima facie* case of employment discrimination based on race and marital status, we conclude, as did the trial court, that she has failed to show that the reasons given for her termination could reasonably be found pretextual. She argues that the establishment of a *prima facie* case precludes summary judgment in defendants'/appellees' favor. Our decision in *Hollins v. Federal Nat'l Mortgage Ass'n*, 760 A.2d 563 (D.C.2000), shows that in certain rare cases, summary judgment is possible even though a plaintiff has established a *prima facie* case, and despite the fact that: "Courts are justifiably hesitant to throw out employment discrimination claims on summary judgment, since they almost always involve issues concerning the employer's (or supervisor's) motive or intent." *Hollins, supra*, 760 A.2d at 570–71.

Indeed, as in *Hollins*, "[t]his case ... presents one of the rare situations in which summary judgment ... is appropriate" in such an employment discrimination case. *Id.* at 571. Skadden provided ample, undisputed evidence that its decision to terminate Dr. Wallace was based on legitimate, non-discriminatory reasons, and that discrimination was not a determining factor in Dr. Wallace's termination. In contrast, even "taking all reasonable inferences [in this matter] in the light most favorable to [Dr. Wallace]," we are constrained to conclude that "a reasonable juror, acting reasonably, could not find in her favor under the appropriate burden of proof." *See Fred Ezra Co., supra*, 687 A.2d at 591.

Dr. Wallace devotes considerable argument to Rick Hindman, one of her supervisors in the Communications Group at Skadden. While conceding that her own work contained errors, she asserts that: "Hindman, a white and childless associate, who was vastly more experienced than Plaintiff, simply declined to perform his job of ensuring the accuracy of the work sent to the client." The short answer to Dr. Wallace's concentration on Mr. Hindman is that, in a discrimination context, she must show that other "similarly situated employees" were treated differently, but Mr. Hindman was not a "similarly situated employee" because he was not a junior associate. *See Blackman, supra*, 694 A.2d at 871. To sustain her burden, Dr. Wallace must show that she was treated differently from a Skadden employee, all of whose relevant employment aspects were "nearly identical" to hers. *See Hollins, supra*, 760 A.2d at 578 (reference omitted).

■ With respect to instances in which Mr. Hindman allegedly refused to excuse Dr. Wallace so that she could be with one or more of her children, such as being present for her daughter's Saturday birthday party, the District of Columbia Human Rights Act ("the DCHRA") "contains no explicit requirement that an employer accommodate an employee's working schedule so that the employee can discharge his or her 'family responsibilities.' " *Simpson v. District of Columbia Office of Human Rights*, 597 A.2d 392, 405 (D.C.1991). Nor has Dr. Wallace cited any interpretation of the DCHRA by the Office of Human Rights requiring such accommodation.

Dr. Wallace also focuses on an alleged attempt by an African American female partner, Antoinette Cook Bush, who is married and has two young children, to force African American associates to leave Skadden. She cites as an example of Ms. Bush's effort, Timothy Robinson. Yet, although Mr. Robinson acknowledges in his declaration that Ms. Bush informed him of an opportunity at the United States Department of Commerce, he also states that he: "left the firm because there was a

great opportunity within the Department of Commerce to work with the administrator of the National Telecommunications and Information Administration." In addition, Mr. Robinson denied that his race affected his work assignments and pay level at Skadden. Dr. Wallace also alleges that Ms. Bush convened an unusual meeting of African American associates to publicly discuss Dr. Wallace's termination. However, undisputed evidence presented by Skadden shows that Dr. Wallace's termination actually was done privately after business hours and in the presence only of Ms. Bush and another Skadden partner, and that Dr. Wallace was given three months' severance pay. The meeting of minority associates was called to allay their anxiety only after Dr. Wallace publicized her termination.

Dr. Wallace contends that she was treated differently from other departing associates because, unlike James Tanner, an African American, and John Burke, a Caucasian, she was not provided an employment reference, and that even if she had signed the release of liability form, only the dates of her employment would have been provided to prospective employers.[4] While there is some indication in the record that Mr. Burke gave the name of a Skadden superior to a prospective employer without signing a release form, even taken in the light most favorable to Dr. Wallace, this alone does not support an inference of discrimination given Skadden's apparent reference in behalf of Mr. Tanner.

Skadden's evidence shows that Dr. Wallace was not timely with some of her work products, even though her work at times was evaluated as "good." In addition, in at least one instance, a client asked that Dr. Wallace not be assigned to any of the client's work because of Dr. Wallace's errors. Samples of Dr. Wallace's work submitted by Skadden reflect the errors which prompted negative evaluations. Despite serious questions about some of Dr. Wallace's work products and her attitude with respect to superiors, Skadden did not immediately terminate Dr. Wallace. Rather, the firm permitted her to transfer from the International Trade Group to the Communications Group, but Dr. Wallace's work still fell short of Skadden's standards. Skadden then placed Dr. Wallace on probation for three months. The record shows that her performance improved, and she was taken off probation in January 1995. However, she continued to make errors in her work, and to miss assignment deadlines. In addition, her billable hours were lower than those of other associates.[5] Therefore, she received only two-thirds of a discretionary bonus. In August, 1995, she was again placed on probation.

■ Under the circumstances shown by the record before us, Dr. Wallace's case is quite different from that of the employee in *Blount v. National Ctr. for Tobacco–Free Kids*, 775 A.2d 1110 (D.C.2001), a case on which Dr. Wallace relies. We deemed *Blount* to be a "very close [case]." *Blount*, 775 A.2d at 1115. We emphasized that, unlike the evidence presented in Dr.

---

4. According to the declaration of Linda Rickman, former *Professional Personnel Administrator* at Skadden, the firm has a policy of providing only the dates of employment if an employee does not sign one of two release forms. In her supplemental declaration, Dr. Wallace states that she "never saw the release forms ....[,]" and that "a legal headhunter ... told [her] that a 'dates of employment' reference was a code for 'do not hire.'" But there is no indication that she ever signed one of the release forms, in accordance with Skadden's policy.

5. Dr. Wallace's supplemental declaration states that she had 900 billable hours for the first six months of 1995.

Wallace's case: "Ms. Blount evidently had an excellent record at [her previous place of employment] and, according to her, she was never told, prior to her discharge, that her performance was unsatisfactory." *Id.* (footnote omitted). Dr. Wallace had unsatisfactory records at her prior place of employment, was told her performance at Skadden was not satisfactory, and was placed on probation twice at Skadden. In *Blount,* we also recognized that Ms. Blount would not face an easy task in trying to show pretext because: " 'Employers who knowingly hire workers within a protected group seldom will be credible targets for charges of pretextual firing.' " *Id.* at 1114 (quoting *Proud v. Stone,* 945 F.2d 796, 798 (4th Cir.1991)). In short, the facts of *Blount* are quite different. Based upon our review of the record, we conclude that no genuine issue of material fact exists, and defendants/appellees were entitled to judgment as a matter of law.

### Dr. Wallace's Discovery Misconduct Allegations

■ Dr. Wallace also argues that "the attorney misconduct committed by Defendants–Appellees and their counsel was so egregious and pervasive as to irreversibly taint the lower court proceedings and significantly prejudice Appellant Dr. Wallace's rights." Specifically, she accuses appellees of corrupt and undue financial influence with respect to the discovery process by (1) arranging for the representation of former Skadden employees involved as witnesses, and (2) violating the Rules of Professional Conduct [6] and District laws pertaining to bribery and obstruction of justice. Dr. Wallace failed to raise these arguments in any form in the trial court. Consequently, we decline to consider them at this point. *See Hollins, supra,* 760 A.2d at 572 (arguments not raised in the trial court are ordinarily waived on appeal); *Miller v. Avirom,* 127 U.S.App. D.C. 367, 369, 384 F.2d 319, 321 (1967) ("In our jurisprudential system, trial and appellate processes are synchronized in contemplation that review will normally be confined to matters appropriately submitted for determination in the court of first resort.") (footnote omitted).

■ Finally, we summarily dispose of Dr. Wallace's appeals of the judgments of costs. The decision to award costs to a prevailing party is a discretionary one. *See Harris v. Sears Roebuck & Co.,* 695 A.2d 108, 110 (D.C.1997). Although Dr. Wallace argues that she is unable to pay the costs,[7] we have said that even an indigent party is not relieved entirely of "the responsibility for the costs of litigation." *Robinson v. Howard Univ.,* 455 A.2d 1363, 1367 (D.C.1983). The sums awarded by the trial court with respect to Dr. Wallace's defamation and discrimination actions are modest compared with the totals sought by Skadden. Thus, it is clear that the trial court exercised its discretion in a

---

**6.** Dr. Wallace alleges violations of Rules 3.4(a), (b) and (f); 4.3(a); 5.4(c); 7.1(b)(2); and 8.4.

**7.** Dr. Wallace also contends that the trial court erroneously treated appellees' bill of costs in the defamation suit as an unopposed motion. But she ignores the salient fact that the trial court, in ruling on her motion for reconsideration of its order awarding costs, expressly considered her arguments in opposition to the bill of costs. In addition, while it is true that the trial court barred recovery of certain deposition costs, deposition videotaping costs and hearing transcript costs in the discrimination suit but allowed appellees to recover these same expenses in the defamation suit, the simple explanation is that Dr. Wallace made no such challenge to these costs in the course of the defamation suit. It was not until two-and-one-half months after the final order of costs in the defamation action that Dr. Wallace first challenged these costs in the context of the discrimination suit.

manner which recognizes that "the antagonists are very unevenly matched in size, resources, and stability . . . ." *Harris, supra,* 695 A.2d at 110 (quoting *Boas Box Co. v. Proper Folding Box Corp.,* 55 F.R.D. 79, 81 (E.D.N.Y.1971)). We discern no abuse of discretion.

Accordingly, for the foregoing reasons, we affirm the judgment of the trial court.

*So ordered.*